**BRISTOL HOTEL MANAGEMENT CORPORATION, et al.,**
Plaintiffs,

v.

**AETNA CASUALTY & SURETY COMPANY, et al.,**
Defendants.

**No. 97–2240–CIV.**

United States District Court,
S.D. Florida.

Aug. 26, 1998.

C. Oliver Burt, III, Michael J. Pucillo, R. Scott Palmer, Burt & Pucillo, West Palm Beach, Fl, for Plaintiffs.

Melvyn I. Weiss, Richard H. Weiss, Deborah Clark–Weintraub, Stephen H. Schwartz, Milberg Weiss Bershad Hynes & Lerach LLP, New York City, Fred Misko, Jr, Charles E. Ames, Fred Misko, Jr., P.C., Dallas, TX, Michael C. Dodge, Brian Casey, Dodge & Associates, P.C., Dallas, TX, Roberto Martinez, Colson, Hicks, Eidson, Colson & Matthews, Miami, FL, for Travelers & Aetna Ins. Companies.

Christopher Seeger, Weissman & Seeger, New York City, for Plaintiffs.

Richard L. Williams, Miami, FL, Martin L. Steinberg, Holland & Knight, Miami, FL, for Cigna Corp.

Richard H. Critchlow, Kenny, Nachwalter, et al., Miami, FL, for The Kemper Group.

Thomas M. Sherouse, Anderson, Moss, Sherouse & Petros, P.A., Miami, FL, for The Hartford.

D. David Keller, Bunnell, Woulfe, Kirshbaum, Keller & McIntyre, P.A., Ft. Lauderdale, FL, for Ohio Cas. Ins. Co. a/k/a/ The Ohio Cas. Group, American Fire and Cas. Co., West American Ins. Co.

Steven E.M. Hartz, Nina K. Brown, Akerman, SEnterfitt & Eidson, P.A., Miami, FL, for CNA & Liberty Mut.

Richard M. Dunn, Rubin, Baum, Levin, et al., Miami, FL, for Employers Ins. of Wausau.

Michael L. McCluggage, Wildman, Harrold, Allen & Dixon, Chicago, IL, for CNA Ins.

Curtis L. Frisbie, Jr., Mark W. Bayer, Randy D. Gordon, Gardere & Wynne, L.L.P., Dallas, TX, for AIU Ins. Co., American Home Assur. Co., American Intern. Group.

Ed Kaufman, Alan M. Grunspan, Kaufman, Miller, Dickstein & Grunspan, P.A., Miami, FL, James R. Safley, Robins, Kaplan, Miller & Ciresi L.L.P., Minneapolis, MN, Robert C. Walters, Russell Yager, Brian E. Robison, Vinson & Elkins, L.L.P., Dallas, TX, Francis Anania, Donald Blackwell, Anania, Bandklayder & Blackwell, Miami, FL, for Johnson & Higgins.

Hendrik G. Milne, Craig P. Kalil, Aballi, Milne, Kalil & Garrigo, P.A., Miami, FL, Robert Scott Newman, Marlow, Connell, Valerius, Abrams & Adler, Miami, FL, Cathy S. Reiman, Cummings & Lockwood, Naples, FL, Mark Hicks, Hicks & Anderson, P.A., Miami, FL, Daniel C. Brown, Kenneth W. Donnelly, Katz, Kutter, Haigler, Alderman, Bryant & Yon, Tallahassee, FL, for General Acc. Ins. Companies.

M. Stephen Smith, Joshua D. Lerner, Rumberger, Kirk & Caldwell, P.A., Miami, FL, Thomas E. Manick, Adorno & Zeder, Miami, FL, for TIG Group.

David S. Mandel, David S. Mandel, P.A., Miami, FL, for American Financial.

Billy R. McGill, David Moran, Kevin T. Crocker, Jackson & Walker, LLP, Dallas, TX, for Chubb Indem. Ins. Co., Federal Ins.

Co., Great Northern Ins. Co., Pacific Indem. Co. and Vigilant Ins. Co.

Daniel F. Beasley, Patrick E. Gonya, Fowler, White, et al., Miami, Florida, for Old Republic Group.

Barry R. Bell, Lyman G. Hughes, Carrington, Coleman, Sloman & Blumenthal, L.L.P., Dallas, TX, for Cigna Corp., Bankers Standard Fire and Marine Co., Bankers Standard Ins. Co., Century Indem. Co., Cigna Employers Ins. Co., Cigna Fire Underwriters Ins. Co., Cigna Ins. Co., Cigna Property and Cas. Ins. Co., Indem. Ins. Co. of N.A., Ins. Co. of N.A., Pacific Employers Ins. Co.

Douglas B. Brown, Rumberger, Kirk & Caldwell, P.A., Orlando, Florida, for Coregis Ins. Co.

Guy C. Quinlan, Gary R. Carney, Jr., Rogers & Wells, New York City, L. Louis Mrachek, Gunster, Yoakley, Valdes–Fauli & Stewart, P.A., West Palm Beach, FL, for NCCI.

### ORDER OF DISMISSAL

MORENO, District Judge.

This case is a class action suit alleging a wide-spread conspiracy on the part of numerous insurance companies to charge illegally high prices for workers' compensation insurance policies in Florida. Because the Court concludes that the McCarran–Ferguson Act, 15 U.S.C. § 1011 *et seq.*, bars the Plaintiffs' federal claims in their entirety, the Court grants the Defendants' motions to dismiss and dismisses the Plaintiffs, claims with prejudice.

### Background

#### 1. Worker's Compensation

Workers' compensation insurance is an insurance product sold to employers to cover the costs of medical care and rehabilitation for employees injured within the course and scope of their employment. It also provides coverage for lost wages and death benefits for the dependents of workers killed in work-related accidents. All Florida employers are required by law to provide workers' compensation insurance to their employees, either by self-insuring or by purchasing insurance from an entity authorized to transact the business of workers' compensation insurance in the State of Florida. Every year, Florida employers pay hundreds of millions of dollars in premiums and other charges for workers' compensation insurance.

Florida maintains what is called a residual market program for the writing of workers' compensation policies for those employers that cannot otherwise obtain workers' compensation insurance. Insurance companies that underwrite workers' compensation risks within Florida are assigned (voluntarily or through an assignment system) to a residual market participant. When an insurance company is assigned to an employer, that employer is referred to as an "Assigned Risk Participant." During the relevant years, it was illegal for an insurance company covering workers' compensation risks of Assigned Risk Participants to cover the losses incurred with respect to Assigned Risk Participants ("residual market losses") by making assessments against other workers' compensation policy holders, unless those assessments were previously filed with and approved by the Insurance Commissioner. In other words, without the permission of the Commissioner, an insurance company could not offset the losses incurred in a policy with an Assigned Risk Participant by charging higher rates to other insureds.

#### 2. Retrospective Rating Plans

A retrospective rating plan takes into account an employer's actual experience in controlling and reducing losses related to the insurance plan and offers the insured an opportunity to receive credit or refund if the premium paid exceeds the actual losses covered by the policy. In other words, under a retrospective plan, the insured ultimately pays a premium based on the losses actually incurred during the policy coverage period rather than a rate fixed prior to the policy coverage period. Losses may be paid for several years beyond the policy period and are subject to periodic adjustment. Accordingly, the policy typically remains open as long as claims are being paid and adjusted, in some instances years beyond the end of the coverage period. Generally, retrospectively rated plans are less expensive than standard guaranteed costs plans. In Florida, retrospective rating arrangements are the pre-

dominant workers' compensation vehicle for medium- and large-size employers.

### 3. The Allegations

The named Plaintiffs are employers who purchased workers' compensation insurance policies from several of the Defendants. Plaintiffs allege that those Defendants as well as the rest of the Insurer Defendants, acting individually and conspiring with and aiding and abetting one another, charged the employers insurance prices that varied from the filings that had been made and approved by the Commissioner. Among other things, the Insurer Defendants used higher-than-allowed "tax multiplier" to calculate amounts owing under the Policies and added a residual market surcharge to the lawful, approved premium even though the approved premium already contained a market charge and the Commissioner had never authorized an additional surcharge. Plaintiffs allege that the Insurer Defendants engaged in this illegal scheme with the assistance of the National Council on Compensation Insurance ("NCCI"), an organization that had a duty to discover and put a stop to the illegal practices. Finally, Plaintiffs allege that the Defendants took steps to fraudulently conceal the unlawful conduct so that the Plaintiffs and the members of the Class could not discover the conspiracy. As a result of the illegal conduct, the Plaintiffs allege that they have sustained damages in the form of excess payments for insurance policies. Plaintiffs bring six causes of action: violation of the Sherman Act and the Florida Antitrust Act; violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961 *et seq.;* breach of contract; unlawful civil conspiracy; and unjust enrichment.

### Standard of Review

A court will not grant a motion to dismiss unless the plaintiff fails to prove any facts that would entitle the plaintiff to relief. *Conley v. Gibson,* 355 U.S. 41, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). When ruling on a motion to dismiss, a court must view the complaint in the light most favorable to the plaintiff and accept the plaintiff's well-pleaded facts as true. *Scheuer v. Rhodes,* 416 U.S. 232, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974); *St. Joseph's*

*Hospital, Inc. v. Hospital Corp. of America,* 795 F.2d 948 (11th Cir.1986).

### Legal Analysis

The Defendants move to dismiss the Plaintiffs' antitrust claims on the grounds that the Defendants' acts are exempt from antitrust liability under the McCarran–Ferguson Act.

### 1. McCarran–Ferguson Act

Congress enacted the McCarran–Ferguson Act in response to the Supreme Court's decision in *United States v. South–Eastern Underwriters Association,* 322 U.S. 533, 64 S.Ct. 1162, 88 L.Ed. 1440 (1944). Prior to that decision, courts had assumed that the business of insurance did not involve interstate commerce and was therefore beyond the reach of federal legislative authority. Thus, "the States enjoyed a virtually exclusive domain over the insurance industry." *St. Paul Fire & Marine Ins. Co. v. Barry,* 438 U.S. 531, 539, 98 S.Ct. 2923, 57 L.Ed.2d 932 (1978). With the expansion of the Supreme Court's conception of interstate commerce, in *South–Eastern Underwriters,* the Supreme Court held that an insurance company conducting business across state lines was engaged in interstate commerce and was therefore subject to federal antitrust laws. 322 U.S. at 533, 64 S.Ct. 1162.

This result obviously threatened the unfettered power of the States to tax and regulate the insurance industry. "To allay those fears, Congress moved quickly to restore the supremacy of the States in the realm of insurance regulation. It enacted the McCarran–Ferguson Act within a year of the decision in *South–Eastern Underwriters.*" *United States Dep't of Treasury v. Fabe,* 508 U.S. 491, 500, 113 S.Ct. 2202, 124 L.Ed.2d 449 (1992).

■ The first section of the McCarran–Ferguson Act makes this purpose clear:

> Congress hereby declares that the continued regulation and taxation by the several States of the business of insurance is in the public interest, and that silence on the part of the Congress shall not be construed to impose any barrier to the regulation or taxation of such business by the several States.

15 U.S.C. § 1011. As the Supreme Court recognized shortly after the Act's passage, Congress declared expressly and affirmatively "that continued state regulation and taxation of this business is in the public interest," *Prudential Ins. Co. v. Benjamin,* 328 U.S. 408, 430, 66 S.Ct. 1142, 90 L.Ed. 1342 (1946), and that therefore "[t]he business of insurance ... shall be subject to the laws of the several States." 15 U.S.C. § 1012(a). The McCarran–Ferguson Act guarantees to the states the power to regulate the business of insurance free from inadvertent preemption by federal statutes of general applicability:

> No Act of Congress shall be construed to invalidate, impair, or supersede any law enacted by any State for the purpose of regulating the business of insurance ... unless such Act specifically relates to the business of insurance: Provided, That ... the Sherman Act ... shall be applicable to the business of insurance to the extent that such business is not regulated by State Law.

15 U.S.C. § 1012(b). Section 3(b) of the Act makes clear, however, that the Act should not be read to immunize from Sherman Act liability "any agreement to boycott, coerce, or intimidate, or act of boycott, coercion, or intimidation." 15 U.S.C. § 1013(b).

### 2. Plaintiffs' Antitrust Claims

■ Taking these sections together, the McCarran–Ferguson Act will exempt from the federal antitrust laws conduct that is the business of insurance, is regulated by state law, and does not constitute a boycott. *Slagle v. ITT Hartford,* 102 F.3d 494, 497 (11th Cir.1996). The Plaintiffs do not argue that Florida does not regulate the business of insurance or that the Defendants' alleged activity constitutes a boycott. Instead the Plaintiffs attempt to persuade the Court that the alleged unlawful rate-setting on the part of the Defendants does not constitute the "business of insurance." This argument is unconvincing. The Supreme Court has developed a three-part test for determining whether particular conduct constitutes the "business of insurance." *See Union Labor Life Ins. Co. v. Pireno,* 458 U.S. 119, 129, 102 S.Ct. 3002, 73 L.Ed.2d 647 (1982). A court must examine three questions: (1) whether the practice has the effect of transferring or spreading a policyholder's risk;

(2) whether the practice is an integral part of the policy relationship between the insurer and the insured; and (3) whether the practice is limited to entities within the insurance industry. *See id.* It cannot seriously be contended that rate-setting does not satisfy all three factors. The setting of rates for workers' compensation insurance has the obvious effect of transferring or spreading the policyholder's risk, is an integral part of the policy relationship, i.e., represents the price of the insurance policy, and is limited to entities within the insurance industry. For this reason, the Supreme Court has noted: "Certainly the fixing of rates is part of [the business of insurance]," *S.E.C. v. Nat'l Sec., Inc.,* 393 U.S. 453, 460, 89 S.Ct. 564, 21 L.Ed.2d 668 (1969), and numerous courts have so held, *see, e.g., Slagle,* 102 F.3d at 498 ("[W]e conclude that appellees' alleged rate-fixing conduct is the 'business of insurance.'"). This can come as no real surprise in view of the fact that, in enacting the McCarran–Ferguson Act, "the primary concern of both representatives of the insurance industry and Congress was that cooperative rate-making efforts be exempt from antitrust laws." *Group Life & Health Insurance Co. v. Royal Drug Co.,* 440 U.S. 205, 221, 99 S.Ct. 1067, 59 L.Ed.2d 261 (1979). In short, the McCarran–Ferguson act, which restores to the states the exclusive power to regulate the insurance industry except where Congress specifically acts to supplant that authority, bars the Plaintiffs from challenging the alleged conduct as a violation of the federal antitrust laws.

### 3. Plaintiffs' RICO Claims

■ While the Defendants have not moved to dismiss the Plaintiffs' RICO claims, it is equally clear that the language of the McCarran–Ferguson Act and the legislative purpose underlying it further bar the Plaintiffs' RICO claims. Conduct that is the business of insurance and is regulated by state law is immunized by the McCarran–Ferguson Act not only from federal antitrust liability, but from the reach of *any* federal statute not specifically relating to the business of insurance that would invalidate, impair, or supersede the state regulatory regime. *See* 15 U.S.C. § 1012(b). It cannot be questioned

that the RICO statute does not specifically relate to the business of insurance. Accordingly, whether the Plaintiffs' RICO claims survive the McCarran–Ferguson Act turns on whether the application of federal RICO laws would invalidate, impair, or supersede the Florida insurance regulation scheme.

The words "invalidate, impair or supersede" are not defined in the McCarran–Ferguson Act, and courts have split on whether the application of RICO would invalidate, impair, or supersede state insurance regulatory regimes. *Compare Doe v. Norwest Bank Minnesota, N.A.,* 107 F.3d 1297 (8th Cir.1996) (applying RICO to the business of insurance would impair the state insurance scheme), *and Ambrose v. Blue Cross & Blue Shield of Virginia, Inc.,* 891 F.Supp. 1153 (E.D.Va.1995), *aff'd,* 95 F.3d 41 (4th Cir.1996) (per curiam) (same) *with Sabo v. Metropolitan Life Ins.,* 137 F.3d 185 (3d Cir.1998) (applying RICO would not impair the state insurance scheme) *and Merchants Home Delivery Serv., Inc. v. Frank B. Hall & Co.,* 50 F.3d 1486 (9th Cir.1995) (same). The Court finds the former line of cases to be more faithful to the language of the McCarran–Ferguson Act and Congressional intent.

The business of insurance in Florida is regulated by an extensive statutory framework. Florida's insurance code includes an Unfair Insurance Trade Practices Act ("UITPA") that proscribes the collection of premiums or charges in excess of those allowed under filed or approved rates, or in excess of premiums and charges specified in the policy. *See* Fla.Stat.Ann. § 626.9541(1)(*o*). Section 624.155 provides for a private right of action under which an aggrieved person can recover for an unlawful premium charge. That section requires that specific and detailed notice of the claim be provided to the insurer and the Department of Insurance as a prerequisite to the filing of any claims. *See* § 624.155(2)(a), (b). Punitive damages are limited to certain cases, *see* § 624.155(4), and class action suits are not authorized, *see* § 624.155(5). The Florida UITPA further contains a section subjecting an insurer to specific monetary penalties by the Department of Insurance, *see* § 626.9521, and permits the Department to issue cease and desist orders for unlawful insurance practices, *see* § 626.9581.

Florida also has a comprehensive framework regulating workers' compensation insurance rates. Section 627.092 creates the position of a Workers' Compensation Administrator whose job is "to monitor carrier practices in the field of workers' compensation." Workers' compensation rates require the prior approval of the Department of Insurance, *see* § 627.091, the policy forms must also be approved by the Department, *see* § 627.410, and excessive, inadequate, or unfairly discriminatory rates must be disapproved by the Department, *see* § 627.062. No insurer may issue a workers' compensation insurance policy unless it is in accordance with the rate filings in effect for such insurer or qualifies for certain exceptions, *see* § 627.191, and providing false or misleading information to the Department, any rating organization, or any insurer is prohibited, *see* § 627.361. Finally, Chapter 4–189 of the Florida Administrative Code contains detailed regulations regarding deviation filings, experience reporting, large deductible filings, excess profit reporting, and excess rate filings.

Facing similar insurance regulatory regimes in other states, the courts that have held that McCarran–Ferguson does not bar federal claims under RICO have reasoned that a federal statute that provides a parallel or duplicate remedial scheme does not "invalidate, impair, or supersede" state regulatory law. This approach is formalistic and would substantially frustrate the goals of the McCarran–Ferguson Act.

RICO does more than simply duplicate the Florida regulatory scheme. As described above, the Florida scheme expressly limits private causes of action: notice requirements are imposed, damages are specifically set forth, punitive damages are limited, and class actions are not authorized. Much of the burden of policing the practice of insurance is instead placed with the Department of Insurance. RICO, by contrast, grants a private cause of action to any injured person, is suited to class plaintiffs alleging far-flung conspiracies, and expressly grants the extraordinary remedy of treble damages, as well as costs and attorney's fees, to victorious plaintiffs. No requirement of notice is neces-

sary. Under these circumstances, it is simply impossible to say that to allow a RICO challenge to an allegedly illegal insurance practice would not "invalidate, impair, or supersede" Florida's detailed insurance regime. Indeed, given the incredible advantages that RICO affords to an aggrieved party, to permit Plaintiffs to proceed under RICO would render Florida's recovery scheme obsolete. Surely, Congress could not have intended such a result when it declared that "the continued regulation ... by the several States of the business of insurance is in the public interest." 15 U.S.C. § 1011. To allow the legality of insurance practices to be determined in the federal courts would eviscerate that declared policy altogether. In short, the Court finds that the McCarran–Ferguson Act also bars the Plaintiffs' RICO claims.

**4. Plaintiffs' Remaining Non–Federal Claims**

Given that the Court has dismissed the Plaintiffs' federal claims, the Court will dismiss without prejudice the remaining state law claims pursuant to *United Mine Workers v. Gibbs,* 383 U.S. 715, 726, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966).

### Conclusion

Congress has squarely expressed its intent to leave the regulation of the business of insurance to the states. The McCarran–Ferguson Act specifically exempts the business of insurance from generally-worded federal statutes that would interfere with the regulatory schemes that the states, in their plenary power, elect to implement. The Sherman Act and RICO, the claims under which the Plaintiffs proceed here, are two such statutes because they grant injured plaintiffs private rights of action that vastly exceed those allowed under Florida law. For this Court to allow the Plaintiffs' claims to proceed would frustrate the clear purpose of the McCarran–Ferguson Act, and the dismissal of this case will ensure that the legality of the Defendants' conduct is evaluated precisely by the standards that McCarran–Ferguson intended: state law. Accordingly, it is

ADJUDGED that the Defendants' motions to dismiss are GRANTED. This case, namely the entire complaint, is DISMISSED with prejudice, and all pending motions are DENIED as moot.