### VALLEY MED FLIGHT, INC., Plaintiff,

v.

### Terry DWELLE, M.D., in his Official Capacity as State Health Officer of the North Dakota Department of Health, and Bryan Klipfel, in his Official Capacity as Executive Director of the North Dakota Workforce Safety & Insurance, Defendants.

Case No. 1:15-cv-070

United States District Court, D. North Dakota.

Signed March 21, 2016

Ronald J. Knoll, Joshua M. Feneis, Anderson & Bottrell, Fargo, ND, Judith R. Nemsick, Holland & Knight LLP, New York, NY, for Plaintiff.

Douglas Alan Bahr, Attorney General's Office, Bismarck, ND, for Defendants.

## ORDER GRANTING PLAINTIFF'S MOTION FOR JUDGMENT ON THE PLEADINGS

Daniel L. Hovland, District Judge, United States District Court

Before the Court is the Plaintiff's Motion for Judgment on the Pleadings filed on August 5, 2015. See Docket No. 13. The Defendants filed a brief in opposition to the motion on September 30, 2015. See Docket No. 21. On October 28, 2015, the Plaintiff filed a reply brief. See Docket No. 25. For the reasons set forth below, the motion is granted.

## I. BACKGROUND

### A. THE PARTIES AND CLAIMS

The Plaintiff, Valley Med Flight, Inc. ("Valley Med") is a North Dakota corporation with its principal place of business in Grand Forks, North Dakota. Valley Med provides emergency air ambulance services within the State of North Dakota and to destinations in nearby states using fixed and rotary wing aircraft.

Valley Med is authorized by the Federal Aviation Administration ("FAA") to operate as a Part 135 air carrier providing on-demand air ambulance services. Valley Med is also registered with the United States Department of Transportation ("DOT") to operate as a Part 298 air taxi

operator providing on-demand services. Pursuant to these certifications, Valley Med is authorized to operate interstate flights and is an "air carrier" for purposes of the Airline Deregulation Act of 1978 ("ADA"), 49 U.S.C. § 41713(b). As an emergency care provider, Valley Med may be dispatched by the emergency department of a hospital or by an attending physician under regulations and procedures set out by the Emergency Medical Treatment and Active Labor Act ("EMTALA"), 42 U.S.C. § 1395dd. In a seven count complaint, Valley Med seeks declaratory and injunctive relief to prevent the enforcement of two North Dakota laws it contends are preempted by the ADA and the EMTALA.

Defendant Terry Dwelle, M.D., is the State Health Officer for the North Dakota Department of Health. Valley Med's claims against the Department of Health relate to the recent enactment of North Dakota House Bill 1255 ("HB 1255"), which requires, inter alia, air ambulance operators to become participating providers with certain North Dakota health insurance companies in order to be listed on a "primary call list" for air ambulance services.

Defendant Bryan Klipfel is the Executive Director of the North Dakota Workforce Safety & Insurance ("WSI"). WSI is the state agency charged with managing North Dakota's workers' compensation system. Valley Med's claims against WSI relate to WSI's enforcement of Section 65-02-08 of the North Dakota Century Code, Section 92-01-02-45.1(22) of the North Dakota Administrative Code, and the related fee schedule for reimbursement of air ambulance services provided by air ambulance operators.

## B. House Bill 1255

In January 2015, House Bill 1255 was introduced as a bill in the North Dakota House of Representatives. In April 2015, House Bill 1255 was passed by both houses of the North Dakota Legislature and signed into law by Governor Dalrymple. House Bill 1255 is codified at N.D.C.C. § 23-27-04.10.[1] Section 23-27-04.10 provides as follows:

1. The department shall create and maintain a primary call list and a secondary call list of air ambulance service providers operating in this state.

2. To qualify to be listed on the primary call list, an air ambulance service provider shall submit to the department attested documentation indicating the air ambulance service provider is a participating provider of the health insurance carriers in the state which collectively hold at least seventy-five percent of the health insurance coverage in the state as determined by annual market share reports.

3. The department shall provide the primary call list and the secondary call list for air ambulance service providers operating in this state to all emergency medical services personnel, each hospital licensed under chapter 23-16, each 911 coordinator in this state, and each public safety answering point operating in this state.

4. The department shall establish air ambulance service response zones for rotary wing aircraft which are based on response times and patient health and safety.

   a. Upon receipt of a request for air ambulance services, emergency medical services personnel, a hospital licensed under chapter 23-16, or a pub-

---

**1.** It appears a portion of House Bill 1255 may have been codified at N.D.C.C. § 50-24-.1-16 as well, however, Valley Med's complaint and briefs make no mention of it, and thus the Court need not address it.

lic safety answering point operating in this state, shall make a reasonable effort to inform the requesting party of the estimated response time for the requested air transport versus the ground transport for that designated response zone. If at any point during the request for air ambulance services the requester withdraws the request, the receiving party is not required to complete that call for air ambulance services.

b. If emergency medical services personnel, a hospital licensed under chapter 23-16, or a public safety answering point operating in this state receives a request from emergency medical services personnel for air ambulance services, the recipient of the request shall comply with the call priority under this subdivision in responding to the request.

(1) First, the recipient of the request shall call an air ambulance service provider listed on the primary call list which is within the designated response zone.

(2) Second, if each of the air ambulance service providers listed on the primary list is not available or is not able and willing to respond to the call, the recipient of the request shall notify the requester of this fact and shall call an air ambulance provider listed on the secondary call list within the designated response zone.

(3) Third, if each of the air ambulance service providers listed on the secondary list is not available or is not able and willing to respond to the call, the recipient of the request shall notify the requester of this fact and shall inform the requester of primary and secondary air ambulance service provider options outside the designated response zone.

5. Upon request of the department, a potential patient, or a potential patient's legal guardian, an air ambulance service provider shall provide that provider's fee schedule, including the base rate, per loaded mile rate, and any usual and customary charges.

a. The department shall compile and distribute this fee information to each hospital licensed under chapter 23-16, each hospital emergency department in the state, each physician the department determines is likely to generate an air ambulance transport, each emergency medical services operation, each emergency medical services professional, emergency medical services personnel, each public safety answering point in this state, and each 911 coordinator in this state.

b. Before a hospital refers a patient to an air ambulance service provider, the hospital shall make a reasonable effort to inform the patient or the patient's legal guardian of the fees for the air ambulance service providers licensed under this chapter, for the purpose of allowing the patient or legal guardian to make an informed decision on choosing an air ambulance service provider. A hospital is exempt from complying with this subdivision if the hospital determines compliance might jeopardize the health or safety of the patient.

6. The state health council shall adopt rules establishing air ambulance service provider requirements that must address transport plans, including auto launch protocol and auto launch cancellation protocol; transporting to the nearest appropriate medical facility; medical necessity; and informed consent. As necessary, the state health council shall adopt rules relating to quality of care standards and other appropriate re-

quirements regarding air ambulance service providers. N.D.C.C. § 23–27–04.10.

Under Section 23–27–04.10, the Department of Health is instructed to "create and maintain a primary call list and a secondary call list of air ambulance service providers operating in this state." N.D.C.C. § 23–27–04.10(1). In order to qualify to be listed on the primary call list, Section 23–27–04.10 requires "an air ambulance service [to] submit to the [Department of Health] attested documentation indicating the air ambulance service provider is a participating provider of the health insurance carriers in the state which collectively hold at least seventy-five percent of the health insurance coverage in the state as determined by annual market share reports." N.D.C.C. § 23–27–04.10(2)).

Under Section 23–27–04.10, the Department of Health will distribute the primary and secondary call lists for air ambulance service providers operating in North Dakota "to all emergency service personnel, each hospital licensed under chapter 23-16, each 911 coordinator in the state, and each public safety answering point operating in the state." N.D.C.C. § 23–27–04.10(3). The Department of Health also will establish "service response zones for rotary wing aircraft which are based on response times and patient health and safety." N.D.C.C. § 23–27–04.10(4). Upon receipt of requests for air ambulance services, reasonable efforts are to be made to inform the requesting party of the estimated response time and for the requested air transport versus the ground transport for that designated time zone. N.D.C.C. § 23–27–04.10(4)(a). The recipient of the request for air ambulance services must first contact a provider in the designated response zone from the primary call list and, if a primary call responder is not available, contact a provider on the secondary call list within that zone. If no secondary call list responders are available, the requesting party will be notified of options outside the designated response zone. N.D.C.C. § 23–27–04.10(4)(b)(1)–(3).

Section 23–27–04.10 further requires that upon request of the Department of Health, a potential patient, or a potential patient's legal guardian, an air ambulance service operator must provide its fee schedule. N.D.C.C. § 23–27–04.10(5). This fee information shall be compiled and distributed to each hospital licensed under chapter 23-16; each hospital emergency department in the state; each physician likely to generate air ambulance transport; each emergency medical services operation, professional and personnel; each public safety answering point; and each 911 coordinator in the state. N.D.C.C. § 23–27–04.10(5)(a). In order that a patient may make an informed decision when choosing an air ambulance, before a hospital refers a patient to an air ambulance service provider, efforts must be made to inform the patient or the patient's legal guardian of the fees for air ambulance services. N.D.C.C. § 23–27–04.10(5)(b). Such a notification is not required if it would jeopardize the health or safety of the patient. Id.

Blue Cross Blue Shield of North Dakota ("BCBS") controls more than 50% of the health insurance market in North Dakota. In order for an air ambulance service provider to be included on the primary call list it must become a participating provider with health insurance carriers in the state which collectively hold at least 75% of the health insurance coverage in the state. Thus, it is clear and undisputed that a provider must become a participating provider with BCBS in order to be listed on the primary call list.

Following the passage of House Bill 1255, Valley Med was not on the primary call list because it was not a participating provider with BCBS. Prior to the passage

of House Bill 1255, Valley Med and BCBS had been unable to reach an agreement which would have allowed Valley Med to become a BCBS participating provider because they could not agree on reimbursement rates. In order to be listed on the primary call list, Valley Med signed a one-year agreement with BCBS on May 12, 2015. Valley Med contends the reimbursement rates it accepted under this agreement are substantially below the market rate. Valley Med further contends that it will be unable to sustain its operations in North Dakota if it is forced to accept rates mandated by BCBS, rather than its own rates.

## C. WSI AIR AMBULANCE FEE SCHEDULE

WSI has the authority to establish and enforce a fee schedule for air ambulance services. N.D.C.C. § 65–02–08. A provider who renders medical treatment to an injured employee in North Dakota's jurisdiction is subject to WSI's rules and fee schedules. The fees on claims for medical and hospital goods and services provided to an injured employee must be in accordance with the fee schedules adopted by WSI. WSI has published a schedule of air ambulance rates. The WSI Remittance Form for air ambulance claims contains the following language:

> PROVIDER NOTICE—APPLICABILITY OF LAW
>
> Injured employees covered by the North Dakota Workers Compensation Act fall under the jurisdiction of North Dakota statutes and receive benefits pursuant to North Dakota Century Code, Title 65 and North Dakota Administrative Code, Chapter 92–01-02.

North Dakota law does not allow a medical service provider to bill the patient, the patient's employer, or any other insurer for any services rendered as a result of the compensable work injury. Specifically, North Dakota Administrative Code § 92–01–02–45.1(22) prohibits a provider of medical services from billing a claimant for the difference between the provider's charges and the amount set by WSI's fee schedules, a practice known as "balance billing."

Valley Med has submitted numerous claims to WSI for payment for air ambulance services provided by Valley Med to injured employees in North Dakota between September 2013 and April 2015. WSI has declined to pay Valley Med's rates, and instead has paid the claims according to the rates set forth in the Workers' Compensation Fee Schedule. Valley Med anticipates that it will continue to provide air ambulance services to injured employees and submit claims to WSI for payment at Valley Med's rates, which WSI will decline to pay.

## II. STANDARD OF REVIEW

■ Rule 12(c) of the Federal Rules of Civil Procedure establishes that "[a]fter the pleadings are closed—but early enough not to delay trial—a party may move for judgment on the pleadings." "Judgment on the pleadings is appropriate where no material issue of fact remains to be resolved and the movant is entitled to judgment as a matter of law." Faibisch v. Univ. of Minn., 304 F.3d 797, 803 (8th Cir.2002) (citing United States v. Any & All Radio Station Transmission Equip., 207 F.3d 458, 462 (8th Cir.2000)). When presented with a motion for judgment on the pleadings, a district court must "accept as true all factual allegations set out in the complaint" and "construe the complaint in the light most favorable to the plaintiff, drawing all inferences in his favor." Wishnatsky v. Rovner, 433 F.3d 608, 610 (8th Cir.2006). The standard for judgment on the pleadings is the same as that for failure to state a claim under Rule 12(b)(6) of the Federal Rules of Civil Procedure. Ash-

ley County, Ark. v. Pfizer, Inc., 552 F.3d 659, 665 (8th Cir.2009).

> When considering a motion for judgment on the pleadings (or a motion to dismiss under Fed. R. Civ. P. 12(b)(6)), the court generally must ignore materials outside the pleadings, but it may consider "some materials that are part of the public record or do not contradict the complaint," as well as materials that are "necessarily embraced by the pleadings."

Porous Media Corp. v. Pall Corp., 186 F.3d 1077, 1079 (8th Cir.1999) (internal citations omitted).

## III. LEGAL DISCUSSION

### A. ADA (AIRLINE DEREGULATION ACT OF 1978) PREEMPTION

■ "It is a familiar and well-established principle that the Supremacy Clause, U.S. Const., Art. VI, cl. 2, invalidates state laws that 'interfere with, or are contrary to,' federal law." Hillsborough County, Fla. v. Automated Med. Labs., Inc., 471 U.S. 707, 712, 105 S.Ct. 2371, 85 L.Ed.2d 714 (1985) (internal citations omitted). This invalidation is accomplished by way of federal preemption, which "is invoked under the directive of the Supremacy Clause." Brown v. Hotel & Rest. Emps. & Bartenders Int'l. Union Local 54, 468 U.S. 491, 500, 104 S.Ct. 3179, 82 L.Ed.2d 373 (1984); see Kurns v. R.R. Friction Prods. Corp., —— U.S. ——, 132 S.Ct. 1261, 1265, —— L.Ed.2d —— (2012) (stating preemption of state law occurs through the direct operation of the Supremacy Clause).

■ Under the Supremacy Clause, federal law may supersede, or preempt, state law in several different ways: (1) Congress may expressly state that federal law preempts state law (express preemption); (2) Congress' intent to preempt state law may be inferred from its comprehensive regulation of an area of law (field preemp-

tion); or (3) state law may actually conflict with the federal law (conflict preemption)—i.e., where compliance with both federal law and state law is a physical impossibility, or where the state law stands as an obstacle to accomplishment and execution of the full purposes and objectives of Congress. Hillsborough, 471 U.S. at 713, 105 S.Ct. 2371; see also Gunter v. Farmers Ins. Co., Inc., 736 F.3d 768 (8th Cir.2013) (citing Hillsborough, 471 U.S. at 712, 105 S.Ct. 2371); Botz v. Omni Air Int'l, 286 F.3d 488, 493 (8th Cir.2002) ("Congress may evince its intent to pre-empt state law either implicitly or explicitly").

The ADA contains an express preemption clause which provides as follows:

> (b) Preemption.—(1) Except as provided in this subsection, a State, political subdivision of a State, or political authority of at least 2 States may not enact or enforce a law, regulation, or other provision having the force and effect of law related to a price, route, or service of an air carrier that may provide air transportation under this subpart.

49 U.S.C. § 41713(b)(1). It is undisputed that Valley Med is an "air carrier."

The United States Supreme Court has on three occasions offered guidance as to how the ADA's express preemption clause is to be construed. The ADA was enacted in 1978 after Congress determined that deregulation of the airline industry would lead to greater reliance on market forces resulting in greater efficiency, innovation, lower prices, and enhanced quality and variety of air transportation services. Morales v. Trans World Airlines, Inc, 504 U.S. 374, 378, 112 S.Ct. 2031, 119 L.Ed.2d 157 (1992). In order to prevent the states from circumventing federal deregulation by enacting their own regulation of the airline industry, Congress included a broad preemption clause in the ADA prohibiting the states from enforcing any law or regula-

tion related to an air carrier's rates, routes, or services. Id. at 383–84, 112 S.Ct. 2031. In *Morales*, the United States Supreme Court held that the ADA expressly preempted the application of state deceptive business practice laws to airline fare advertisements because such regulation related to the content and format of air carrier fare advertising and had a significant impact thereon. Id. at 388–91, 112 S.Ct. 2031. The Supreme Court explained the ADA's broad preemption clause meant state laws and regulations "having a connection with or reference to airline rates, routes, or services, are preempted by the ADA." Id. at 384, 112 S.Ct. 2031. More important, even an indirect effect occasioned by laws of general applicability is sufficient to meet the "relating to" language in the preemption clause. Id. at 386–87, 112 S.Ct. 2031. Laws which are consistent with the ADA's purpose are preempted nevertheless. Id. The Supreme Court noted that in some cases the regulations might have too tenuous or remote an impact to be preempted. Id. at 387, 390, 112 S.Ct. 2031.

The United States Supreme Court reaffirmed in Am. Airlines, Inc. v. Wolens, 513 U.S. 219, 224, 115 S.Ct. 817, 130 L.Ed.2d 715 (1995) the breadth of the ADA's preemption clause. In *Wolens*, the plaintiffs were participants in American Airlines frequent flyer program who claimed to be injured by modifications to the program and brought suit claiming breach of contract and violation of the Illinois Consumer Fraud Act. Id. at 224–25, 115 S.Ct. 817.

The Supreme Court held the Consumer Fraud Act claims were preempted by the ADA while the breach of contract claims were not preempted. Id. at 226, 115 S.Ct. 817. The Supreme Court explained that the frequent flyer program in question related to rates as the airline gave mileage credits for free tickets and upgrades and services because the program provided ac-

cess to flights and service class upgrades regardless of capacity controls and blackout dates. Id. The Supreme Court noted the Consumer Fraud Act was prescriptive, controlled conduct, and served as a means of policing the marketing practices of airlines. Id. at 227–28, 115 S.Ct. 817. Given the text and purpose of the Consumer Fraud Act, it was preempted by the ADA. Id. at 228, 115 S.Ct. 817.

The breach of contract claims on the other hand were not preempted because a breach of contract claim does not allege a violation of a state-imposed obligation but rather alleges violation of a self-imposed obligation. Id. The terms and conditions of a frequent flyer program are privately ordered obligations. Id. ADA preemption only applies to state laws and regulations. Id. at 229, 115 S.Ct. 817. The Supreme Court stressed that the purpose of the ADA was to promote market efficiency and the ability to enforce private contracts through a breach of contract action was fundamental to a stable and efficient market. Id. at 230, 115 S.Ct. 817. Any sensible construction of the ADA required that agreements freely made not be preempted.

In Northwest, Inc. v. Ginsberg, —— U.S. ——, 134 S.Ct. 1422, 1426, 188 L.Ed.2d 538 (2014), the Supreme Court held that a airline customer's claim for breach of the implied covenant of good faith and fair dealing was preempted by the ADA. The airline had terminated the customer's membership in the airline's frequent flyer program based on alleged abuse of the program. The customer sued alleging, among other things, the termination of his membership violated the implied covenant of good faith and fair dealing. Id. at 1427. The Supreme Court explained that even state common law rules like the implied covenant of good faith and fair dealing are preempted by the ADA because the ADA preemption provision was very broadly

worded, and exempting common law claims would be contrary to the central purpose of the ADA. Id. at 1429–30. The Supreme Court stressed that what was important was the effect of the state law, provision, or regulation and not its form and state common law rules can undermine the purpose of the ADA just as surely as statutes and regulations. Id. at 1430. The Supreme Court further explained that the claim in question was clearly related to "rates, routes, or services" because the plaintiff sought reinstatement in the airline's frequent flyer program so that he could accrue mileage credits which could be redeemed for tickets and upgrades. Id. at 1430–31. In addition, the implied covenant claim was a state-imposed obligation rather than one the parties voluntarily undertook because the parties cannot contract out of the covenant. Id. at 1431–32.

With this background in mind, the Court will turn to the question of whether the ADA preempts Sections 23–27–04.10 and 65–02–08 of the North Dakota Century Code. In addition, the Court will address the applicability of the McCarran-Ferguson Act's reverse preemption provision.

### 1. WHETHER THE ADA PREEMPTS N.D.C.C § 23–27–04.10

■ Valley Med contends Section 23–27–04.10 of the North Dakota Century Code is a clear attempt to regulate air ambulance service providers. Valley Med further contends that because the law in question has a significant impact on the prices, routes, and services of air ambulance service providers, the law is preempted by the ADA. Defendants Dwelle and Klifpel (collectively "State") contend Section 23–27–04.1 is not related to Valley Med's prices, routes, or services. In light of *Morales, Wolens, and Ginsberg,* the State's position is unpersuasive.

The phrase "related to" in the ADA preemption clause has been construed very broadly. Botz v. Omni Air Int'l, 286 F.3d 488, 493 (8th Cir.2002) (finding Minnesota's whistleblower statute did not protect a flight attendant who claimed she was fired after refusing a flight assignment which she claimed violated federal regulations). For instance, the ADA has been found to preempt a New York law which required airlines to provide fresh air, restroom, water, and food to passengers subject to lengthy ground delays. Air Transport Ass'n of Am. v. Cuomo, 520 F.3d 218, 222 (2nd Cir.2008) (finding the required accommodations related to the service of an air carrier). An express preemption clause has also been found to prevent a state from controlling entry into the field of air ambulance service by requiring a state issued license, because such a regulation relates to an air ambulance's service. Hiawatha Aviation of Rochester, Inc. v. Minn. Dep't of Health, 389 N.W.2d 507, 509 (Minn. 1986) (applying the preemption provision of the Federal Aviation Act which is nearly identical to the ADA's preemption provision). Similarly, a state may not require a certificate of need before an air ambulance service enters the market in a particular state. Med–Trans Corp. v. Benton, 581 F.Supp.2d 721, 740 (E.D.N.C.2008); Baptist Hosp., Inc. v. CJ Critical Care Transp. Sys. of Fla., Inc., No. CV–07–900193, at 2 (Cir.Ct. Montgomery Cty., Ala. July 31, 2007); Rocky Mountain Holdings LLC v. Cates, No. 97–4165–CV–C–9 (W.D.Mo. Sept. 3, 1997).

In *Med–Trans,* the court found the certificate of need requirement "clearly related to plaintiff's price, route, or service under the ADA" and constituted a direct substitution of state governmental commands for the market forces Congress sought to protect when it enacted the ADA. Med–Trans, 581 F.Supp.2d at 736. The impact of the certificate of need requirement was significant as it barred the plaintiff from performing flight operations

in North Carolina. Id. If the teaching of the Supreme Court in *Morales* is that the ADA does not permit states to regulate an air carriers advertising about rates and services then surely a law which potentially results in an air carriers complete inability to operate within a state is also preempted.

In this case, the impact of Section 23–27–04.10 on Valley Med's prices, routes, and services is clear and significant. Section 23–27–04.10(1) mandates the creation of primary and secondary call lists. Section 23–27–04.10(2) specifies the qualifications air ambulance service providers must meet in order to be listed on the primary call list. Further, in order to qualify for the primary call list an air ambulance service provider must become a participating provider with insurance carriers in North Dakota which collectively control 75% of the market. In order to become a participating provider, an air ambulance service provider must accept the reimbursement rates offered by the insurance carrier. In addition, BCBS controls more than 50% of the health insurance market in North Dakota. Thus, in order for an air ambulance service provider to be included on the primary call list under North Dakota law, it must become a participating provider with BCBS. The State argues that becoming a "participating provider" is simply a business decision made by air ambulance operators. However, it is clear to the Court that air ambulance operators who work in the North Dakota market have no choice but to become a "participating provider" (and accept an insurer's rates) or discontinue operating in the state.

The primary and secondary call lists are provided to the entities responsible for summoning an air ambulance. N.D.C.C. § 23–27–04.10(3). Air ambulance service providers listed on the primary call list receive dispatch priority. N.D.C.C. § 23–27–04.10(4). This priority gives air ambulance service providers on the primary call list a competitive advantage over air ambulance service providers on the secondary call list. Such an advantage clearly impacts services under the ADA. Air ambulance service providers on the primary call list will undoubtedly receive more calls for service than providers on the secondary call list. Any provider on the secondary call list will finds its ability to provide services air ambulance services severely restricted. Med–Trans, 581 F.Supp.2d at 736 (preempting North Carolina law which required a state licence to operate an air ambulance service). There is no question that such interference with air ambulance service providers market participation is precisely the type of state regulation Congress sought to prevent when it included an express preemption clause in the ADA. Morales, 504 U.S. at 378, 112 S.Ct. 2031; Rowe v. N.H. Motor Transp. Ass'n, 552 U.S. 364, 371–72, 128 S.Ct. 989, 169 L.Ed.2d 933 (2008) (finding a Maine's attempt to regulate tobacco delivery services was preempted under the rationale established in *Morales*).

Section 23–27–04.10 clearly impacts the prices air ambulance service providers may charge as well. The law effectively requires providers to become BCBS participating providers and accept BCBS's reimbursement rates in order to be placed on the primary call list. The law directly impacts air ambulance services, and indirectly impacts the prices of the operators who become participating providers. By granting preferential treatment to certain air ambulance operators, the new law essentially drives secondary call list operators from the market. It is a law's effect, rather than its form, which is of critical importance in the preemption analysis. Ginsberg, 134 S.Ct. at 1430. It is undisputed that BCBS's reimbursement rates are lower the than the rates Valley Med charges, or would like to charge. There

can be little question Section 23–27–04.10 effects Valley Med's prices and thus relates to price under the ADA. The clear intent of the legislation is to prevent air ambulance service providers, who are not participating providers, from imposing exorbitant fees on patients who wrongly assume their insurance will cover the charges and are not in a position to discover otherwise. This type of consumer protection law is precisely the type of law Congress sought to preempt when it enacted the ADA. Cuomo, 520 F.3d at 219–20 (finding the ADA preempted the New York State Passenger Bill of Rights).

Further, the law requires air ambulance service providers to make their fee schedule public upon request. N.D.C.C. § 23–27–04.10(5). Such a requirement clearly relates to price and is very similar to the advertising regulations which the Supreme Court found were preempted in Morales. Morales, 112 S.Ct. at 2040–41. "Compelling or restricting price advertising surely relates to price." Id. at 389, 112 S.Ct. 2031 (internal citations omitted). Compelling a provider to furnish its fee schedule upon request relates to price as well.

The Court concludes, as a matter of law, that Section 23–27–04.10 of the North Dakota Century Code is preempted by the Airline Deregulation Act of 1978. While the policy choices the State is attempting to impose in Section 23–27–04.10 are well-intentioned and enacted in good faith, it is clear that Congress has assumed the field in the arena of air carrier regulation and noble intent does not save the law from preemption. No matter how noble the State's intent in passing regulations or laws in this area, such acts are clearly preempted. The new law places primary bargaining power for the pricing of air ambulance services in the hands of primarily one health insurer. The State's contention that portions of the law are severable is not persuasive. The Court will address the State's McCarran-Ferguson Act reverse preemption argument below.

## 2. WHETHER THE ADA PREEMPTS N.D.C.C § 65–02–08

Valley Med also contends the ADA preempts North Dakota Century Code § 65–02–08, North Dakota Administrative Code § 92–01–02–45.1(22), and the related air ambulance fee schedule because these laws "relate to" the prices that air ambulance service providers may charge in North Dakota. Section 65–02–08 provides that "[a]ll fees on claims for medical and hospital goods and services provided under this title to an injured employee must be in accordance with schedules of fees adopted by the organization." This provision applies to medical services provided by air ambulances. See N.D.A.C. § 92–01–02–29(12), (13). WSI's fee schedules are part of its overall managed care program designed "to effect the best medical solution for an injured employee in a cost-effective manner . . . ." N.D.C.C. § 65–02–20.

Section 92–01–02–45.1(22) of the North Dakota Administrative Code provides a "provider may not bill a claimant a fee for the difference between the maximum allowable fee set forth in the organization's fee schedule and usual and customary charges, or bill the claimant any other fee in addition to the fee paid, or to be paid, by the organization for individual treatments, equipment, and products." Section 92–01–02–45.1 was promulgated under the authority of, and to implement various provisions of, Title 65 of the North Dakota Century Code which applies to North Dakota's workers' compensation system.

Valley Med contends these provisions collectively mandate the reimbursement rates for air ambulance services and impermissibly prohibit balance billing to the employer, employee, or other insurer in violation of the ADA's express preemption

clause. The Court agrees that the only fair characterization of these provisions is that they directly impact Valley Med's prices and services under the ADA. The State admits these provisions apply to services provided by air ambulances. See Docket No. 21, pp. 22 and 26. The State's only contention in support of the provisions is that the McCarran-Ferguson Act's reverse preemption clause saves N.D.C.C. § 65–02–08, N.D.A.C. § 92–01–02–45.1(22), and the related fee schedule, from preemption because these provisions were enacted in order of regulate the "business of insurance."

### a. McCARRAN-FERGUSON ACT REVERSE PREEMPTION

The McCarran-Ferguson Act was enacted to assure states the preeminent role in the regulation of the insurance industry. United States Dep't of Treasury v. Fabe, 508 U.S. 491, 500, 113 S.Ct. 2202, 124 L.Ed.2d 449 (1993) (holding an Ohio statute governing priority of claims against an insolvent insurer was enacted for the purpose of regulating the "business of insurance" and thus the McCarran-Ferguson Act saved the Ohio statute from preemption by the federal priority statute). The "reverse preemption" clause of the McCarran-Ferguson Act provides that "[n]o Act of Congress shall be construed to invalidate, impair, or supersede any law enacted by any State for the purpose of regulating the business of insurance, or which imposes a fee or tax upon such business, unless such Act specifically relates to the business of insurance." 15 U.S.C. § 1012(b) (emphasis added). "The McCarran-Ferguson Act thus precludes application of a federal statute in face of state law 'enacted . . . for the purpose of regulating the business of insurance,' if the federal measure does not 'specifically relat[e] to the business of insurance,' and would 'invalidate, impair, or supersede' the State's law." Humana Inc. v. Forsyth, 525 U.S. 299, 307, 119 S.Ct. 710, 142 L.Ed.2d 753 (1999) (in-ternal citations omitted) (holding McCarran Ferguson Act did not preclude application of federal RICO laws, which did not specifically relate to the business of insurance, because the Nevada insurance laws in question were not impaired by RICO).

Laws aimed at protecting or regulating the relationship between the insurer and the insured, whether directly or indirectly, are considered laws which regulate the "business of insurance." Fabe, 508 U.S. at 501, 113 S.Ct. 2202. The focus of the McCarran-Ferguson Act is the relationship between the insurance carrier and the policyholder. Fabe, 508 U.S. at 501, 113 S.Ct. 2202. This relationship includes both the writing and performance of insurance contracts. Id. at 503, 113 S.Ct. 2202. The Supreme Court has identified three criteria relevant in determining whether a particular enactment regulates the "business of insurance" within the meaning of the McCarran-Ferguson Act: "*first*, whether the practice has the effect of transferring or spreading a policyholder's risk; *second*, whether the practice is an integral part of the policy relationship between the insurer and the insured; and *third*, whether the practice is limited to entities within the insurance industry." Union Labor Life Ins. Co. v. Pireno, 458 U.S. 119, 129, 102 S.Ct. 3002, 73 L.Ed.2d 647 (1982) (holding an insurance company's use of a chiropractic professional association's peer review committee, to determine whether chiropractic treatments and charges were necessary and reasonable, did not constitute the "business of insurance" within the meaning of the McCarran-Ferguson Act and thus the practice was not exempt from scrutiny under federal anti-trust law).

### i. N.D.C.C. § 23–27–04.10

It is undisputed that the ADA, which contains an express preemption clause which the Court has concluded in-

validates Section 23–27–04.10, does not specifically relate to the "business of insurance." Thus, the only question before the Court is whether Section 23–27–04.10 was enacted "for the purpose of regulating the business of insurance." 15 U.S.C. § 1012(b).

The State contends Section 23–27–04.10 was enacted for the purpose of regulating the "business of insurance" and thus the ADA's express preemption clause is reverse preempted by the McCarran-Ferguson Act. Valley Med maintains Section 23–27–04.10 was not enacted for the purpose of regulating the "business of insurance" but rather was enacted to regulate the fees charged by air ambulance service providers.

The State's position is unpersuasive. The structure and text of Section 23–27–04.10 clearly demonstrate it does not regulate the "business of insurance" as that phrase is used in the McCarran-Ferguson Act. Rather, the clear purpose of Section 23–27–04.10 is to protect patients from unwittingly incurring exorbitant charges for air ambulance services which their health carrier will not cover because the air ambulance service provider was not a participating provider with the patient's health carrier.

■ The first prong of the *Pireno* test addresses the spreading of a policyholder's risk. The transfer of risk is complete when the contract of insurance is entered. Fabe, 508 U.S. at 503, 113 S.Ct. 2202. There is no doubt the actual performance of an insurance contract, including enforcement of the contract, constitutes the "business of insurance." Fabe, 508 U.S. at 503, 113 S.Ct. 2202. The regulated practice here is the provision of air ambulance services; not the performance of an insurance contract. Section 23–27–04.10 does not regulate any activities of insurance carriers or the performance of an insurance contract.

■ The second prong of the *Pireno* test asks whether the practice is an important part of the relationship between the insurer and insured. The relationship between the insurer and the insured lies at the core of the "business of insurance." Fabe, 508 U.S. at 501, 113 S.Ct. 2202. The focus in the second prong of the *Pireno* test is the contract between the insurer and the insured. Pireno, 458 U.S. at 128, 102 S.Ct. 3002. Prescribing the terms of an insurance contract is a direct regulation of the "business of insurance". Fabe, 508 U.S. at 502–03, 113 S.Ct. 2202. Section 23–27–04.10 does not alter or in any way directly affect any policy of insurance between an insured and insurer by prescribing the type of policy which may be issued, the terms of the policy, how the policy is to be interpreted, the rate to be charged, or the enforcement of the contact. Rather, it affects the relationship between the air ambulance service provider and the insurance carrier by compelling the air ambulance service provider to become a preferred provider in order to be placed on the primary call list or suffer the consequences of being relegated to the secondary call list.

The third prong of the *Pireno* test asks whether the practice is limited to entities in the insurance industry. Section 23–27–04.10 is aimed at the business activities of air ambulances. While an air ambulance service provider may submit bills to insurance providers, the air ambulance service provider remains a third-party to the contract between the insurer and the insured. As the Supreme Court has explained, an insurer's arrangements with third-party providers are merely cost-saving measures that reduces the insurer's cost of covering a loss that it was already obligated to cover. Group Life & Health Ins. Co. v. Royal Drug Co., 440 U.S. 205, 214, 99 S.Ct. 1067, 59 L.Ed.2d 261 (1979) (holding an insurer's agreement with participating pharmacies to provide low cost prescrip-

tion drugs to policyholders was not the "business of insurance" so as to exempt the pharmacy agreements from anti-trust scrutiny under the McCarran-Ferguson Act).

In the final analysis, Section 23–27–04.10 is aimed at protecting the patient by coercing the air ambulance service provider to become a participating provider with the insurer. The Court has no trouble concluding as a matter of law that Section 23–27–04.10 is not aimed at "adjusting, managing, or controlling the business of insurance." Fabe, 508 U.S. at 505, 113 S.Ct. 2202. The McCarran-Ferguson Act's focus is on the relationship between the insurance carrier and the policyholder. Fabe, 508 U.S. at 501, 113 S.Ct. 2202. Since Section 23–27–04.10 alters the relationship between the provider and the insurer rather than the policyholder and the insurer its focus is not on the "business of insurance." If, for instance, Section 23–27–04.10 altered the terms of the policy to protect the policyholder from uncovered air ambulance bills, the outcome may be otherwise. As it is, the Court concludes as a matter of law that Section 23–27–04.10 of the North Dakota Century Code was not enacted for the purpose of regulating the "business of insurance."

### ii. N.D.C.C. § 65–02–08

■ It is undisputed that the ADA does not specifically relate to the "business of insurance" and its application would invalidate N.D.C.C. § 65–02–08 and N.D.A.C. § 92–01–02–45.1(22). Thus, the question before the Court is whether these provisions were enacted "for the purpose of regulating the business of insurance." 15 U.S.C. § 1012(b).

The State contends Title 65 of the North Dakota Century Code, and the administrative rules promulgated under its authority, were enacted for the purpose of regulating the business of workers' compensation insurance. Thus, the State argues the ADA's express preemption clause is reverse preempted by the McCarran-Ferguson Act. Valley Med disagrees and points out WSI is not an insurance company, does not issue insurance contracts, and is not subject to oversight by the North Dakota Department of Insurance. The State's position is unpersuasive.

■ Title 65 of the North Dakota Century Code, titled Workforce Safety and Insurance, and the rules promulgated to implement it, regulate North Dakota's system of workers compensation. North Dakota adopted its system of workers compensation for the purpose of regulating the employment relationship by substituting the tort system for a system of certain relief as the exclusive remedy for the injured worker. See N.D.C.C. § 65–01–01; see also Wash. Ins. Guar. Ass'n v. Dept. of Labor and Indus., 122 Wash.2d 527, 859 P.2d 592, 596 (1993) (noting six states, including Washington and North Dakota, have adopted public systems of workers compensation which do not compete with private insurance carriers and cannot be described as insurance). The North Dakota Supreme Court has determined that workers compensation is not insurance. Sandlie v. N.D. Workmen's Comp. Bureau, 70 N.D. 449, 295 N.W. 497, 499 (1940) (finding workers compensation was not life insurance, accident insurance, or general social insurance); Beyer's Cement, Inc. v. N.D. Ins. Guar. Ass'n, 417 N.W.2d 370, 373 (N.D.1987) (holding workers compensation is not an insurance fund). A public workers compensation fund cannot be considered the equivalent of insurance. Wash. Ins. Guar. Ass'n., 859 P.2d at 595.

■ The State's attempt to characterize WSI as an insurer is belied by the fact it is a monopolistic state-mandated program. WSI is not a business in any conventional sense. WSI does not issue insurance contracts. The WSI board is not an

insurer. Beyer's Cement, 417 N.W.2d at 373. Benefits are paid pursuant to state law rather than under a policy of insurance. "The funds provided by the workers compensation board are not insurance; they are workers compensation." Id. The State's insurance regulations, which do not apply to WSI, are found in Title 26.1 of the North Dakota Century Code. The references to insurance in Title 65 do not make the protections it provides into insurance as contemplated by Title 26.1. Beyer's Cement, 417 N.W.2d at 373. The Court concludes as a matter of law that WSI is not engaged in the "business of insurance" as that term is used in the McCarran-Ferguson Act, and the provisions in question were not enacted for the purpose of regulating the business of insurance.

A careful examination of the *Pireno* factors confirms the provisions in question were not enacted "for the purpose of regulating the business of insurance." The first and second prongs are clearly lacking because there is no insurance contract which transfers risk or which must be performed. There is no policy holder. Nor is there a relationship between an insured and an insurer. The third prong is also lacking as the provisions of Title 65 do not apply to the insurance industry. Rather, Title 65 regulates the relationship between the employer and the employee and empowers WSI to manage the system. See Brown v. Cassens Transp. Co., 546 F.3d 347, 360 (6th Cir.2008) (applying the *Pireno* factors and concluding Michigan's public workers compensation laws did not equate with insurance and were not enacted for the purpose of regulating the business of insurance and thus McCarran-Ferguson reverse preemption did not apply).

In *Brown*, Michigan employees who had submitted workers compensation claims brought suit against their employer, which was self-insured for workers compensation purposes, for allegedly scheming to deny them workers compensation benefits in violation of federal RICO laws. Id. at 351–52. The district court dismissed the federal RICO claim finding it was reverse preempted by the McCarran-Ferguson Act because the Michigan workers compensation laws were enacted to regulate the business of insurance. Id. at 358–59. The employees appealed. The Sixth Circuit reversed finding the Michigan workers compensation act did not preempt the federal RICO claim because workers compensation benefits are not a form of insurance and the laws were not enacted to regulate the business of insurance. Id. at 361. The Sixth Circuit noted there is no contract in the Michigan workers compensation scheme, no policy holder, and thus no risk spreading. Id. at 360. Also, the mandatory nature of the Michigan workers compensation laws meant the law applied to entities outside the insurance industry. The employer, who in *Brown* was self-insured, was not akin to an insurer. Id. 360–61. The Sixth Circuit stressed that whether Michigan's workers compensation laws addressed practices related to the "business of insurance" is a different inquiry from whether those laws were "*enacted ... for the purpose of regulating* the business of insurance." Id. at 361 (emphasis in original). The Sixth Circuit concluded the Michigan workers compensation laws cannot be seen as being addressed to the "business of insurance" because those laws are a "mandatory, public regulation of the tort-liability relationship between employers and employees rather than a regulation of the contractual insurance relationship that underlies the 'business of insurance.'" Id. at 360.

The State's reliance on In re Workers' Comp. Ins. Antitrust Litig., 867 F.2d 1552 (8th Cir.1989), Fuller v. Olson, 907 F.Supp. 257 (W.D.Mich.1995), Bristol Hotel Mgmt. Corp. v. Aetna Cas. & Sur. Co., 20 F.Supp.2d 1345 (S.D.Fla.1998), and PHI

Air Med. v. Texas Mut. Ins. Co., No. 454–12–7770.M4 (Tex. Office of Admin. Hearings Nov. 13, 2013) is misplaced because those cases involved workers compensation insurance contracts written by private companies. While both *Brown* and *Fuller* involve the application of Michigan workers compensation law, the employer in *Brown* was self-insured for workers compensation purposes while the employer in *Fuller* satisfied workers compensation obligations with a policy obtained from a private insurance company. Brown, 546 F.3d at 361 (describing the fact the employer was self-insured as crucial to the application of the *Pireno* test). Also, *Fuller* was decided long before *Brown* and thus the court in *Fuller* did not have the benefit of the *Brown* court's opinion. North Dakota mandates that all employers participate in its public system of workers compensation. Employers in North Dakota do not have the option of purchasing workers compensation policies in the private market. In *Brown*, as in the present case, there is no relationship between an insurer and an insured. The Court finds the opinion of the Sixth Circuit in Brown instructive and persuasive and adopts its reasoning.

Because workers compensation benefits are not insurance, Section 65–02–08 of the North Dakota Century Code, North Dakota Administrative Code § 92–01–02–45.1(22), and the related air ambulance fee schedules were not enacted for the purpose of regulating the business of insurance. Thus, the McCarran-Ferguson Act does not apply to save these provisions from preemption by the ADA.

## IV. CONCLUSION

Having determined the ADA preempts Sections 23–27–04.10 and 65–02–08 of the North Dakota Century Code, and North Dakota Administrative Code § 92–01–02–45.1(22), and the related air ambulance fee schedule, the Court need not address Val-

ley Med's EMTALA and Commerce Clause arguments. While the Court believes these state laws are well-intentioned, they are clearly preempted by federal law in this case and are unenforceable.

For the reasons set forth above, the Defendants' Motion for Judgment on the Pleadings (Docket No. 13) is **GRANTED.** The Defendants, their employees and agents, are permanently enjoined from enforcing or seeking to enforce Sections 23–27–04.10 and 65–02–08 of the North Dakota Century Code and North Dakota Administrative Code § 92–01–02–45.1(22), and the related air ambulance fee schedules. Let judgment be entered accordingly.

**IT IS SO ORDERED.**