**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 17-2349

AIR EVAC EMS, INC.,

        Plaintiff – Appellee,

   v.

TED CHEATHAM, in his capacity as Director of the Public Employees Insurance Agency; JOHN A. MYERS; RAYMOND S. WHITING; GEOFF S. CHRISTIAN; AMANDA D. MEADOWS; JARED ROBERTSON; LEE R. DINZNOFF; JASON MYERS; WILLIAM MILAM; MICHAEL T. SMITH, in their capacities as members of the Public Employees Insurance Agency's Finance Board; ALLAN L. MCVEY, in his capacity as West Virginia Insurance Commissioner; BILL J. CROUCH, in her capacity as the Secretary for the West Virginia Department of Health & Human Resources,

        Defendants – Appellants,

------------------------------

AMERICA'S HEALTH INSURANCE PLANS,
        Amicus Supporting Appellant,

TEXAS MUTUAL INSURANCE COMPANY,
        Amicus Supporting Appellant.

Appeal from the United States District Court for the Southern District of West Virginia, at Charleston. Thomas E. Johnston, Chief District Judge. (2:16-cv-05224)

Argued: October 31, 2018                Decided: December 7, 2018

Before WILKINSON, FLOYD, and RICHARDSON, Circuit Judges.

_____

Affirmed by published opinion. Judge Wilkinson wrote the opinion, in which Judge Floyd and Judge Richardson joined.

_____

**ARGUED:** Lindsay Sara See, OFFICE OF THE ATTORNEY GENERAL OF WEST VIRGINIA, Charleston, West Virginia, for Appellants. Joshua Lee Fuchs, JONES DAY, Houston, Texas, for Appellee. **ON BRIEF:** Patrick Morrisey, Attorney General, Erica N. Peterson, Assistant Solicitor General, Katherine A. Schultz, Senior Deputy Attorney General, Sean M. Whelan, Assistant Attorney General, OFFICE OF THE ATTORNEY GENERAL OF WEST VIRGINIA, Charleston, West Virginia, for Appellants. Carte Goodwin, FROST BROWN TODD, LLC, Charleston, West Virginia; Charlotte H. Taylor, JONES DAY, Washington, D.C., for Appellee. Julie Simon Miller, Thomas M. Palumbo, AMERICA'S HEALTH INSURANCE PLANS, Washington, D.C.; Hyland Hunt, Ruthanne M. Deutsch, Anne J. Jang, DEUTSCH HUNT PLLC, Washington, D.C., for Amicus America's Health Insurance Plans. Karen Vladeck, WITTLIFF CUTTER AUSTIN PLLC, Austin, Texas; Mary Nichols, TEXAS MUTUAL INSRUANCE COMPANY, Austin, Texas; Matthew Baumgartner, GRAVES, DOUGHERTY, HEARON & MOODY, P.C., Austin, Texas; Paul Schlaud, REEVES & BRIGHTWELL LLP, Austin, Texas, for Amicus Texas Mutual Insurance Company.

_____

WILKINSON, Circuit Judge:

The Airline Deregulation Act of 1978 (ADA) expressly preempts state efforts to regulate the prices, routes, and services of certain air carriers. Beginning in 2011, West Virginia enacted various laws to limit the reimbursement rates of air ambulance companies. Air Evac, an air ambulance company and registered air carrier, sued to enjoin the enforcement of these provisions, arguing that the state's laws were preempted by the ADA. The district court agreed with Air Evac and enjoined the challenged provisions. We now affirm.

I.

A.

The market-driven system for commercial air travel, familiar to travelers today, arose from nearly a century of regulatory change. In 1938, the federal government developed a comprehensive scheme to support the growing use of the nation's skies for commercial aviation. Civil Aeronautics Act of 1938, Pub. L. No. 75-706, 52 Stat. 973. Since its inception, this regulatory regime has included both safety and economic regulations. *Id.* tit. IV, §§ 401-416 (economic regulations); *Id.* tit. VI, §§ 601-610 (civil aeronautics safety regulation). Twenty years later, federal authority over commercial aviation, which had previously been scattered among different agencies, was consolidated under the Federal Aviation Agency (FAA) and Civilian Aeronautics Board (CAB). Federal Aviation Act, Pub. L. No. 85-726, 72 Stat. 731 (1958); *see also* S. Rep. No. 85-

3

1811, at 10 (1958) ("The proposed legislation abolishes the present unnatural division of responsibilities.").

In the subsequent decades, the CAB and the FAA pursued both the economic and safety goals set by Congress. The CAB continued setting strict rates for interstate passenger air travel and controlled entry into the market through its rigorous approval process for new routes, while the FAA oversaw air travel safety. State governments, for their part, actively regulated intrastate air travel as well. The law at the time contemplated dual regulatory regimes and collaboration between the federal and state governments. *See* Federal Aviation Act of 1958, Pub. L. No. 85-726, § 302(k); H.R. Rep. No. 85-2360, at 14 (1958) ("The [Federal Aviation Act] gives the Administrator appropriate administrative powers relating to . . . cooperation with . . . state governments."). Many airlines operated both interstate flights and flights within a single state, such as those from Houston to El Paso. *See* H.R. Rep. No. 95-1211, at 2-3 (1978). Because the law permitted two layers of regulation, these airlines were "required to charge different fares for passengers traveling between cities, depending on whether these passengers were interstate passengers whose fares are regulated by the CAB, or intrastate passengers, whose fare is regulated by a State." *Id.* at 16. This administrative system, which included both independent state and federal regulation and strict control over prices and market entry, was "oriented toward the creation and governmental promotion of [an] air industry" that had not previously existed. S. Rep. No. 95-631, at 52 (1978). In the decades following the passage of the Federal Aviation Act, air travel continued to grow under the dual oversight of federal and state regulators. *Id.* at 1-5.

4

By the 1970s, Congress found that the air industry had outgrown the old regime. Commercial air travel had become common and accessible. Air carriers had developed the resources and infrastructure to compete with one another on open terms in a free market. In Congress's view, the prior economic framework, characterized by two layers of regulation and rigid economic oversight, was ill-suited to the new competitive landscape. Congress responded by enacting the Airline Deregulation Act of 1978 (ADA), which applied the principles of the free market to the commercial aviation sector. *See* Pub. L. No. 95-504, 92 Stat. 1705. Congress's deregulatory goals were embodied in the statute itself, which directed federal regulators to "place[] maximum reliance on competitive market forces" in carrying out their responsibilities. *Id.* § 3.

The ADA achieved its market-oriented ends by transforming the federal economic regulation of air carriers, removing entry barriers and allowing prices to respond to consumer demand. The ADA also ensured that these economic reforms would not be unwound by duplicative and inconsistent state regulation. Instead, air travel would be subject to only one layer of regulation. Economic regulation would be overseen by the Department of Transportation (replacing the CAB), while safety regulations would remain with the Federal Aviation Administration. *See* 49 U.S.C. §§ 40101(a), 40109(a)-(b), 41102, 44103 (2012). Whereas before the states were separate regulators, they now became partners in a unified regulatory framework, consulting with the federal government on local needs. *See, e.g.*, Airline Deregulation Act, § 33, 92 Stat. 1732-34 (providing for consultation on air service determinations in small communities). In the years following passage of the ADA, Congress's deregulatory aims bore fruit as

5

consumer prices fell, even as costs to the industry rose. *See* Gov't Accountability Office, GAO-06-630, Airline Deregulation 18-19 (June 2006); Stephen Breyer, Regulation and its Reform 197-98 (1982) ("Experience since the passage of the [ADA] suggests that [Congress'] diagnosis [was] correct, because prices in real terms have fallen despite rising fuel costs and the industry's profitability has not been significantly affected.").

It is in this deregulatory context that the ADA's preemption clause was enacted. The text of the provision now reads:

> [A] State . . . may not enact or enforce a law, regulation, or other provision having the force and effect of law related to a price, route, or service of an air carrier that may provide air transportation under this subpart.

49 U.S.C. § 41713(b)(1).

After the U.S. Code was reorganized in 1994, the clause now appears in Subpart II of the amended Federal Aviation Act, which includes "economic regulations" and is administered by the Department of Transportation. Pub. L. No. 103-272 (1994) (amending Title 49 of the U.S. Code "without substantive change"). As the plain language of the preemption clause demonstrates, Congress sought to prevent states from imposing a wide variety of regulations on the aviation industry. The provision accordingly expressed a "broad pre-emptive purpose" that is consistent with the deregulatory aims of the statute. *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 383 (1992).

B.

It is now forty years since the passage of the ADA, and commercial aviation has continued to grow with and adapt to market forces. One area of active innovation has been healthcare aviation, where air ambulances are now a familiar part of emergency healthcare response. All over the country, but particularly in rural areas, air ambulances can play a vital and life-saving role in responding to medical emergencies. At the federal level, these companies are regulated as air carriers. Like all other regulated air carriers, air ambulances operate under both safety and economic regulation. The FAA, as the agency responsible for administering federal safety regulations generally, provides air ambulance safety authorizations. *See* 49 U.S.C. § 44702; 14 C.F.R. pt. 135 (2014).

The economic authorization for air ambulances is more complex. Because these companies are considered "air taxi operators," they are subject to less extensive regulations than larger carriers, like major commercial airlines or cargo transportation. Whereas the larger air carriers must obtain a "certificate of public convenience and necessity," *see* 49 U.S.C. § 41102(a), the Secretary of Transportation has waived this requirement for air ambulances. *See* 14 C.F.R. § 298.11. The Secretary's authority to waive the certification is discretionary. *See* 49 U.S.C. § 40109(f) ("[T]he Secretary *may* exempt an air carrier from another provision of subpart II . . ." (emphasis added)). As it stands now, air ambulance companies are exempt from some, but not all, of the economic regulations contained in subpart II and are registered with the Secretary of Transportation. *See* 14 C.F.R. § 298.1.

7

Air ambulance services unfortunately do not come cheap. A single flight can cost tens of thousands of dollars. J.A. 120, 211; *see also EagleMed LLC v. Cox*, 868 F.3d 893, 903 (10th Cir. 2017). In response, some insurance companies have refused to pay the full reimbursement costs. The air ambulance companies have in turn sought payment directly from the patients, a practice known as "balance-billing." To prevent covered patients from receiving these bills, some insurers have agreed to pay more to the air ambulance company. For those insurers that did not agree, covered patients were regrettably often stuck with the bill for the remainder. The costs of these services have not gone unnoticed. The Government Accountability Office provided Congress with a report on air ambulance pricing in July of 2017, specifically noting consumer concerns related to balance-billing. *See* Gov't Accountability Office, GAO-17-637, Air Ambulance: Data Collection and Transparency Needed to Enhance DOT Oversight (July 2017). Just a few months ago, Congress took action on the issue. The FAA Reauthorization Act of 2018, which became law during this appeal, addresses air ambulances directly. Pub. L. No. 115-254 (2018). First, it empowers the Secretary of Transportation to collect more data on air ambulance pricing and provide additional information to consumers. *Id.* § 314. Second, it invites stakeholders, including states, into the policymaking process by forming a committee to advise the Secretary of Transportation on air ambulance billing practices. *Id.* § 418(a)-(b). Third, the law gives the Secretary authority to regulate air ambulance companies directly, both to ensure transparency around costs and "to provide other consumer protections for customers of air ambulance operators." *Id.* § 418(f)(3).

8

Many states have also responded, attempting to both lower their own costs and prevent the balance-billing of their citizens. In recent years, states have tried to lower prices either by regulating the amount that air ambulance companies can charge private parties, *see, e.g.*, *Air Evac EMS, Inc. v. Sullivan*, -- F. Supp. 3d --, 2018 WL 3677002, at *2 (W.D. Tex. August 2, 2018), or by requiring air ambulance companies to accept lower reimbursement rates, *see, e.g.*, *Valley Med Flight, Inc. v. Dwelle*, 171 F. Supp. 3d 930, 934-35, 941-42 (D.N.D. 2016) (enjoining a state law that incentivized an air ambulance provider to contract with a private insurance company).

West Virginia, the appellant here, is no exception. Beginning in 2011, the state enacted new laws and regulations aimed at air ambulance expenses. As it now stands, the West Virginia scheme targets air ambulance costs in two contexts. The first is the state workers' compensation system, which covers employees of private companies and is managed by the state's Office of the Insurance Commissioner (OIC). *See* W. Va. Code § 23-4-3(a) (2016). The West Virginia workers compensation system is now privatized, such that private insurers are able to reach separate agreements on reimbursement rates with medical service providers, including air ambulance companies. For private insurers that have not reached separate agreements, however, the reimbursement rates developed by the OIC apply to air ambulance services. *See* W. Va. Code R. § 85-20-9 (2006). The second context is West Virginia's program for paying the medical expenses of its own government employees, administered by the Public Employees Insurance Agency (PEIA). *See* W. Va. Code § 5-16-5(c).

The measures used to lower costs are similar across the two programs. For both the OIC and the PEIA, the state has adopted a fee schedule covering reimbursement rates for air ambulance services that is pegged to the federal Medicare schedule. In 2011, the rate for the PEIA was set at the Medicare rate exactly, while the OIC rate was 35% higher. *See* W. Va. Code § 5-16-8a(a); J.A. 203. The state has also provided that these reimbursement rates are the maximum allowable recovery for air ambulance services reimbursed under the two programs. *See* W. Va. Code §§ 5-16-8a(a); 23-4-3(a)(2). These provisions are then backed up by a ban on balance-billing, such that employees covered under the OIC or PEIA plans cannot be billed directly. *See* W. Va. Code § 16-29D-4. Violations of these regulations subject an air ambulance company to criminal and civil enforcement actions by the state. *See, e.g.*, W. Va. Code §§ 5-16-12(a); 16-29D-8; 23-1-19(a). As a final cost containment measure, West Virginia also enacted a law stating that the PEIA will not reimburse any air ambulance costs for covered employees who entered into a separate subscription agreement with an air ambulance provider like Air Evac. *See* W. Va. Code § 5-16-8a(b). For these patients, the law effectively caps the reimbursement at the subscription price agreed to by the individual patient and the air ambulance company, typically about $100 per year.

Through this combination of low reimbursement rates, refusals to pay for certain services, and prohibitions on directly billing patients, West Virginia avoids the problems faced by private insurers in the marketplace. Whereas an insurer might ordinarily have to agree to higher reimbursement rates to prevent an air ambulance company from billing its patient, West Virginia has simply dictated a relatively low reimbursement rate and

10

prohibited any additional recovery. Under these regulations, the state faces no pressure to bargain up front, and no threat of patients being directly billed on the back end, thereby lowering total reimbursement costs. For its part, Air Evac contends that the state regulations are not only duplicative of and contrary to federal law, but also prevent air ambulance companies from recovering anything like a fair return for their services. Appellee Br. 5-6.

C.

Air Evac, the appellee here, is a provider of air ambulance services in the state of West Virginia. Air Evac has objected to the air ambulance reimbursement rates for years. See Appellee Br. at 7-8. When the company attempted to bill state employees directly, however, the matter was referred to the state Attorney General for possible enforcement. J.A. 550-52. In response, Air Evac stopped balance-billing.

This litigation began in June 2016, when Air Evac sued state administrators to enjoin the West Virginia scheme. Air Evac argued that the state's regulations were both preempted by the Airline Deregulation Act and a violation of the U.S. Constitution's Contracts Clause. Air Evac's suit specifically challenged the fee schedules and other regulations used to cap reimbursement rates covered by the PEIA and the OIC. The separate prohibition on balance-billing was only challenged in the alternative if the PEIA and OIC regulations were upheld. In response, West Virginia first argued that Air Evac lacked standing to challenge the OIC fee schedule. The state also defended its scheme on the merits, arguing both that the challenged provisions were not preempted and that, if they were, the ADA would violate the Tenth Amendment of the U.S. Constitution.

11

On cross-motions for summary judgment, the district court ruled in favor of Air Evac, finding that the state's air ambulance regulations were preempted by the ADA. Specifically, the district court enjoined the state from enforcing the maximum reimbursements caps and fee schedules for both the PEIA and the OIC, as applied to air ambulance companies. *Air Evac EMS, Inc. v. Cheatham*, 2017 WL 4765966, at *10 (S.D. W. Va. Oct. 20, 2017). The court also enjoined the statute requiring air ambulance providers to accept annual subscription fees as full compensation for their services. *Id.* As the district judge explained, the West Virginia scheme both "establishe[d] the rate of reimbursement from the PEIA and the OIC" and "foreclose[d] Air Evac's ability to bill the patient for the full balance," in contravention of the ADA's preemption clause. *Id.* at *7. The district court did not enjoin the balance-billing prohibition, which had only been challenged in the alternative.

On appeal, the constitutional issues have fallen out of the case. The only questions left for us to resolve are whether Air Evac has constitutional standing to challenge the workers' compensation scheme and whether the state's regulations are preempted by the Airline Deregulation Act. We review both questions de novo.

II.

We begin with the question of standing. West Virginia argues that Air Evac lacks standing to challenge the OIC fee schedule, which sets default rates of reimbursement for the state workers' compensation system. According to West Virginia, the schedule has no effect on Air Evac since the state privatized the workers' compensation system and

12

allowed private insurers to enter into their own agreements with medical providers. Under the privatized program, the OIC pays no claims directly to Air Evac and its fee schedule, which sets reimbursement at 135% of the Medicare rate, does not bind any private insurer. According to the state, this change prevents Air Evac from challenging the OIC regulations. We believe that West Virginia asserts an overly restrictive view of standing, one that is at odds with both the controlling law and the facts of this case, and accordingly hold that Air Evac has standing to pursue its claims.

To establish standing under Article III of the Constitution, a plaintiff must have "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016). Since "financial harm is a classic and paradigmatic form of injury in fact," there is no dispute here that Air Evac's alleged loss of payment satisfies the first requirement. *Cottrell v. Alcon Labs.*, 874 F.3d 154, 163 (3d. Cir. 2017) (citations omitted). Instead, the parties' disagreement centers on the second prong: traceability. For an injury to be traceable, "there must be a causal connection between the injury and the conduct complained of" by the plaintiff. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992). While the defendant's conduct need not be the last link in the causal chain, the plaintiff must be able to demonstrate that the alleged harm was caused by the defendant, as opposed to the "independent action of some third party not before the court." *Frank Krasner Enters., Ltd. v. Montgomery Cty.*, 401 F.3d 230, 234 (4th Cir. 2005) (quoting *Allen v. Wright*, 468 U.S. 737, 757 (1984)). On the facts of this case, the question is whether Air Evac can demonstrate that its lower reimbursement rates

13

are attributable to the state's role in administering the workers' compensation system. We conclude that it can.

The OIC regulations constrain Air Evac's ability to seek full reimbursement for its services, thereby causing Air Evac's alleged injury. While West Virginia is correct that the OIC does not directly reimburse Air Evac under the new system, that fact is not dispositive. Traceability does not require that the state cut a check directly to the plaintiff. Instead, the effect of the state's chosen course of action must be considered as an integrated whole. When viewed in the proper light, the causal connection between the OIC regulations and Air Evac's reimbursements is undeniable.

First, the OIC fee schedules set the default rate for air ambulance reimbursement. While private insurers can and do negotiate different rates, they are not required to do so. In fact, Air Evac has in the past been paid the 135% rate provided in the OIC schedule. *See* J.A. 566-67. Even among those private insurers who do negotiate for a different payment, the OIC rate informs the negotiation by establishing a default. Second, the statute governing the OIC prevents air ambulance companies from recovering directly against patients. *See* W. Va. Code § 23-4-3(a)(2). Taken together, the challenged provisions set a default rate lower than what Air Evac would otherwise charge and prevent Air Evac from billing the patient for the difference. This scheme clearly inhibits Air Evac's ability to recover the full charges that it bills for services. Even without a single direct payment from the state to Air Evac, the alleged injury is therefore traceable to the OIC regulations. The injunctive relief sought here, moreover, would redress that injury by allowing Air Evac to collect more of the fees it has billed. As a result, we agree

14

with the district court that Air Evac has demonstrated each of the requirements of constitutional standing with respect to the OIC provisions.

III.

Since this court has jurisdiction over all of Air Evac's claims, the only question left to resolve is whether the Airline Deregulation Act preempts West Virginia's regulation of air ambulance companies. Federal preemption of state law follows from the Framers' core commitment to dual sovereignty, which "is a defining feature of our Nation's constitutional blueprint." *Fed. Mar. Comm'n v. S.C. State Ports Auth.*, 535 U.S. 743, 751 (2002). Under our system, the federal and state governments are guaranteed independent spheres of policy, free from interference by the other. *See Murphy v. Nat'l Collegiate Athletic Ass'n*, 138 S. Ct. 1461, 1475-76 (2018). This federalist arrangement, however, is not solely a matter of separation. In many arenas of public policy, both the state and federal governments are empowered to respond and our federal system guarantees that the people can select a different balance of local and national solutions to solve the problems they face. In this way, the Constitution not only positions the state governments as autonomous and "inviolable sovereigns," The Federalist No. 39, at 245 (James Madison), but also as partners and competitors in shared domains of policy-making. *See generally* Jessica Bulman-Pozen & Heather K. Gerken, Uncooperative Federalism, 118 Yale L.J. 1256, 1260-63 (2009).

So long as Congress stays within the Constitution's enumerated limits, the Supremacy Clause ensures that its preferred division of responsibility between the

national and state governments is afforded respect. U.S. Const. art. VI, cl. 2. Federal preemption of state law is the result of that basic structural guarantee. *See Coll. Loan Corp. v. SLM Corp.*, 396 F.3d 588, 595 (4th Cir. 2005) ("The Supremacy Clause of the Constitution makes federal law the supreme Law of the Land. As a result, federal statutes and regulations . . . can nullify conflicting state or local actions."). In striking an appropriate balance, Congress's choices range from complete reliance on state policy to complete preemption of state law, with many iterations of "cooperative federalism" between these extremes. *See, e.g.*, *Hodel v. Va. Surface Mining & Reclamation Ass'n*, 452 U.S. 264, 289 (1981).

Not surprisingly then, the "purpose of Congress is the ultimate touchstone in every preemption case." *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 485 (1996) (quoting *Cipollone v. Liggett Grp., Inc.*, 505 U.S. 504, 515 (1992)). At times, the intent to displace state law arises only by implication, either because Congress has so thoroughly regulated a field that any state regulation frustrates the national policy or, more likely, because the application of state law poses a conflict to the specific aims of a federal statute. *See, e.g.*, *N.Y. Cent. R.R. Co. v. Winfield*, 244 U.S. 147 (1917) (finding implied "field preemption" in context of the Federal Employers' Liability Act); *Geier v. Am. Honda Motor Co.*, 529 U.S. 861 (2000) (finding a state tort action preempted by federal vehicle safety regulations). In such a case, one of "implied preemption," our understanding of congressional intent is informed by a presumption that Congress does not intend to displace state law in areas of traditional state regulation. *See, e.g.*, *Hillsborough Cty., Fla. v. Automated Med. Labs., Inc.*, 471 U.S. 707, 715 (1985); *Va. Uranium, Inc. v. Warren*,

16

848 F.3d 590, 596-97 (4th Cir. 2017). Like other interpretive canons, this presumption is not an absolute command; it simply reflects our belief that Congress is aware of the states' longstanding regulatory efforts when enacting federal laws.

At other times, Congress speaks directly to preemption in the words of the statute. *See, e.g.*, *Reigel v. Medtronic, Inc.*, 552 U.S. 312, 316 (2008). When faced with an express preemption clause, the text itself "contains the best evidence of Congress' preemptive intent." *Puerto Rico v. Franklin Cal. Tax-Free Tr.*, 136 S. Ct. 1938, 1946 (2016) (quoting *Chamber of Commerce of U.S. v. Whiting*, 563 U.S. 582, 594 (2011)).[1] In such a case, our task is simply to interpret the words as they are written. Since the statute at issue here, the Airline Deregulation Act, includes such an express preemption clause, we now turn to the language that Congress chose.

---

[1] The Supreme Court has made somewhat varying pronouncements on presumptions in express preemption cases. *Compare Puerto Rico*, 136 S. Ct. at 1946 (declining to adopt a presumption against preemption when interpreting an express preemption clause), *and Riegel*, 552 U.S. at 316 (same), *with Altria Grp., Inc. v. Good*, 555 U.S. 70, 77 (2008) (applying the presumption against preemption "when the text of the pre-emption clause is susceptible of more than one plausible reading"), *and Lohr*, 518 U.S. at 485 (same). The circuits also may not be in full accord. *Compare EagleMed LLC*, 868 F.3d at 903, *with Shuker v. Smith & Nephew, PLC*, 885 F.3d 760, 771 n.9 (3d Cir. 2018). We think the best course is simply to follow as faithfully as we can the wording of the express preemption provision, without applying a presumption one way or the other. And in all events, we need not enter the great preemption presumption wars here because the text of the preemption provision, as discussed *infra*, governs the disposition of this case.

IV.

The ADA's preemption clause expressly defines the contours of prohibited state activity:

> [A] State . . . may not enact or enforce a law, regulation, or other provision having the force and effect of law related to a price, route, or service of an air carrier that may provide air transportation under this subpart.

49 U.S.C. § 41713(b)(1).

This language defines the specific segment of the industry to be regulated ("air carrier[s] that may provide transportation under this subpart"), the specific type of regulation at issue ("related to a price, route, or service"), and the specific form of state action prohibited ("having the force and effect of law"). In the years since the ADA's passage, the Supreme Court has read this preemption provision broadly with respect to air carriers, finding that it displaces a state's generally applicable consumer protection laws related to advertising, *see Morales*, 504 U.S. at 383-85; statutory causes of action related to fraudulent and deceptive practices, *see Am. Airlines, Inc. v. Wolens*, 513 U.S. 219, 228 (1995); and state common law claims for breach of an implied covenant in a contract, *see Northwest, Inc. v. Ginsberg*, 572 U.S. 273, 288 (2014). As a unanimous Court held in *Ginsberg*, the preemption clause's text manifests an intent to "prevent the States from undoing what the Act was meant to accomplish." *Id.* at 283.

While broad, the provision's reach is not unlimited. The ADA preemption clause does not displace individual contractual obligations, *see Wolens*, 513 U.S. at 228-30; nor does it prevent the enforcement of state laws with only a tangential relation to an air carrier's operations, *see, e.g.*, *Gary v. Air Grp., Inc.*, 397 F.3d 183, 189 (3d. Cir. 2005)

18

("We hold [a state law whistleblower] claim is not expressly preempted by the ADA."). These cases demonstrate that when assessing a state law challenged under the ADA, courts must respect the precise boundaries Congress placed on the statute.

West Virginia has made a variety of arguments for why its particular air ambulance regulations are not preempted here. These arguments fall into two groups. The first argues that air ambulances, as an industry, are categorically outside the scope of the ADA preemption clause. The second argues that even if air ambulances are within the reach of the clause as a general matter, the state's particular policies do not run afoul of the ADA. We shall take up these arguments in order.

A.

The question of whether the air ambulance industry is within the scope of the preemption clause turns on whether air ambulances are "air carrier[s] who may provide transportation under [subpart II]." 49 U.S.C. § 41713(b) (2012). As an initial matter, we note that many courts have considered this question and uniformly held that the ADA preemption clause applies to the air ambulance market. *See EagleMed LLC v. Cox*, 868 F.3d 893, 904 (10th Cir. 2017) ("Neither Amicus nor Defendants have presented a single textual reason to support the argument that the broad language of the Airline Deregulation Act's express preemption provision should not include air-ambulance services."); *Air Evac EMS, Inc. v. Sullivan*, -- F. Supp. 3d --, 2018 WL 3677002, at *7 (W.D. Tex. Aug. 2, 2018) ("Air Evac is an air carrier under Subpart II."); *Valley Med Flight, Inc. v. Dwelle*, 171 F. Supp. 3d 930, 933-34 (D.N.D. 2016) (finding the plaintiff

19

air ambulance company "is an 'air carrier' for purposes of the Airline Deregulation Act"); *see also Bailey v. Rocky Mountain Holdings, LLC*, 889 F.3d 1259, 1266 n.13 ("The parties do not dispute [the air ambulance companies'] status as an air carrier.").

1.

West Virginia makes two arguments for why we should depart from this growing consensus. The first is grounded in the meaning of the word "air carrier," which the statute defines to include "common carriers." 49 U.S.C. §§ 40102(a)(2), 40102(a)(25). In the state's view, air ambulances are not common carriers, and therefore regulation of the market is not preempted.

As the district court noted, this "theory is a novel one." *Cheatham*, 2017 WL 4765966, at *5. It runs headlong into the decisions of prior courts and regulators, which have uniformly treated air ambulance companies as common carriers. *See, e.g.*, *Med-Trans Corp. v. Benton*, 581 F. Supp. 2d 721, 732-33 (E.D.N.C. 2008) ("The mere fact that [an air ambulance company] does not collect tickets at the boarding gate does not mean that it is not a common carrier as required by the federal statute."); *TriState CareFlight, LLC*, 41 NMB 55, 60 (2014) (finding air ambulance companies are common carriers under the Railway Labor Act). It also disregards the reasoned judgments of the Department of Transportation and the Federal Aviation Administration, both of which treat Air Evac as an air carrier. *See* 14 C.F.R. pt. 135; *id.* §§ 298.2, 298.3(a); *see also Schneberger v. Air Evac EMS, Inc.*, 2017 WL 1026012, at *2 (W.D. Okla. March 15,

20

2017) ("Because of these federal authorizations, courts have all but uniformly held that air ambulance providers are 'air carriers' under the ADA.").

We have no difficulty concluding as well that air ambulance companies are common carriers. The term "common carrier" is borrowed from the common law and frequently incorporated into federal statutes. *See, e.g.*, 45 U.SC. § 181 (2012) (Railway Labor Act); 47 U.S.C. § 153(11) (Federal Communications Act). The term generally means "[a] commercial enterprise that holds itself out to the public as offering to transport freight or passengers for a fee." *Common Carrier*, Black's Law Dictionary (10th ed. 2014). As the Supreme Court understands the term, "the duty of a common carrier . . . is to transport for hire whoever employs it." *Weade v. Dichmann, Wright & Pugh*, 337 U.S. 801, 807 (1949). A common carrier need not be available to every member of the public; it is enough that the service be available on open terms to even a segment of the population. *See, e.g.*, *M&R Inv. Co. v. Civil Aeronautics Bd.*, 308 F.2d 49, 50 (9th Cir. 1962) ("[I]t is immaterial that the service offered will be attractive only to a limited group."); *United States v. Smith*, 215 F.2d 217, 219 (6th Cir. 1954) ("[Common carrier] status is not changed by the fact that the carrier is rendering a specialized service."). By contrast, "a carrier will not be a common carrier where its practice is to make individualized decisions, in particular cases, whether and on what terms to deal." *Nat'l Ass'n of Regulatory Util. Comm'rs v. FCC*, 525 F.2d 630, 641-42 (D.C. Cir. 1976) (Wilkey, J.).

Air ambulance companies fall squarely within the definition of common carriers. They respond whenever called by emergency medical providers. Patients need not be

21

subscribers or have a preexisting contract to receive services. There is no individual bartering between the air ambulance company and the medical provider over whether to provide life-saving services.

To argue otherwise, West Virginia makes much of the fact that Air Evac, like other air ambulance companies, relies on referrals from medical providers to dispatch its aircraft, rather than responding to calls directly from the public. The state, however, has offered no reason to think that the law turns on any such matter, especially when interpreting a general term like "common carrier." A train does not cease to be a common carrier simply because its tickets are exclusively sold through a third-party vendor. Air Evac, just like its industry competitors, serves the public indiscriminately and on equal terms, and that is what counts here.

2.

Since air ambulance companies are air carriers within the meaning of the ADA, we must now ask whether they are the sort of air carriers the preemption clause was intended to reach. The text of the ADA preemption clause does not sweep in all forms of air transportation, only those air carriers "who may provide air transportation under this subpart." The "subpart" at issue here is Subpart II of the amended Federal Aviation Act. Subpart II is entitled "economic regulations" and is administered by the Department of Transportation. If air ambulances companies "provide air transportation under [subpart II]," they are protected by the preemption clause.

22

On this question, the plain text of the law, the overall structure of the federal aviation laws, and the subsequent acts of Congress all point in the same direction: air ambulances are within the scope of the ADA. In so holding, we align our circuit with the other courts and federal agencies who have considered the same question and reached the same result. *See Hughes Air Corp. v. Pub. Util. Comm'n*, 644 F.2d 1334, 1338-39 (9th Cir. 1981); *Sullivan*, 2018 WL 3677002, at *6-7; Dep't of Transportation, Letter from D.J. Gribbin, Gen Counsel, to Hon. Greg Abbott, Texas Att'y Gen. 8 (Nov. 3, 2008).

"As in any case of statutory construction, our analysis begins with the language of the statute." *Hughes Aircraft Co. v. Jacobson*, 525 U.S. 432, 438 (1999) (internal quotation marks omitted). The dispute here turns on the meaning of the phrase "under this Subpart." The parties agree that air ambulance companies like Air Evac are subject to some regulation contained in Subpart II, such as those related to reporting and non-discrimination obligations. *See, e.g.*, 49 U.S.C. §§ 41705; 41709; 42112. The parties similarly agree that these companies are not certified under Subpart II, like many other air carriers. Instead, air ambulances have been exempted from the requirement to obtain a "certificate of public convenience and necessity," an exemption which has been granted by the Secretary of Transportation. *See* 14 C.F.R. § 298.1. The Secretary's authority to grant this exemption is part of the broader authority to administer subpart II. 49 U.S.C. § 40109(f); *see also id.* § 41102 ("The Secretary of Transportation may issue a certificate of public convenience and necessity."). Even with this exemption, air ambulance companies hold a registration issued by the Secretary. *See* 14 C.F.R. pt. 298.

23

This web of certificates, exemptions, registrations, and other regulations gives rise to the interpretive disagreement between the parties. Air Evac argues that an air carrier provides transportation "under" the subpart when they are subject to the subpart's regulations. Appellee Br. 28. On its view, air ambulance companies operate "under" subpart II because they hold a registration from the Secretary, granted pursuant to the Secretary's authority to administer subpart II, and must comply with some of the subpart's regulations. West Virginia, on the other hand, believes that certification under Subpart II is dispositive. Appellant Br. 16-18. If an air carrier is exempt from the certification requirement, the state contends, they do not "provide air transportation under" subpart II.

We agree with Air Evac that the phrase "under this subpart" includes all air carriers regulated by the Secretary of Transportation under subpart II, rather than those specifically certified under the subpart. By its plain meaning, the word "under" does not suggest it is limited to certain regulations or certain certificates. If Congress wished the preemption clause to only apply to certain certificate-holders, it knew how to do so. For instance, a separate provision of the statute explicitly defines "major air carrier[s]" as those air carriers "holding a Chapter 411 certificate." 49 U.S.C. § 41720(a)(2). The preemption clause, however, does not borrow this language.

The ADA's preemption provision further demonstrates that Congress was fully capable of tying preemption to certification if it so desired. Immediately following the preemption clause at issue here, the next sentence of the ADA reads, "[the preemption clause] do[es] not apply to air transportation provided entirely in Alaska unless the

24

transportation is air transportation . . . provided under a certification issued under Section 41102 of this title." 49 U.S.C. § 41713(b)(2). Put simply, this language clarifies that, in Alaska only, preemption does not apply to air carriers that do not hold Chapter 411 certificates. Despite the fact that Congress chose to tether preemption to certification in this one discrete context, West Virginia asks us to adopt a certification-based reading of the preemption clause across the board. We see no need to adopt such a cumbersome interpretation of the statute's text when a more natural one is available.

Apart from the plain text, the overall structure and operation of the federal aviation laws further support reading the preemption clause to reach air ambulances. The exemption for air ambulance companies from the certification requirements of Chapter 411 is granted by the Secretary of Transportation. The authority to grant this exception is discretionary. *See* 49 U.S.C. § 40109(f) ("[T]he Secretary *may* exempt . . ."). As West Virginia sees it, an exemption from certification is also an exemption from preemption. If we were to adopt this view, however, the Secretary would be empowered to unwind the preemptive effect of the ADA for air carriers as he sees fit. We do not see any basis for inferring such a vast authority, when that authority was never expressly provided and could be used to subvert one of the ADA's principal deregulatory goals.

West Virginia's limited reading of the preemption clause, moreover, would reach well beyond the air ambulance sector. For instance, small commuter air carriers are eligible for the same exemption as air ambulance companies. *See* 14 C.F.R. § 298.11. Likewise, small Canadian air taxi operators that frequently travel to the United States are exempt from the permitting requirement for other foreign air carriers under subpart II.

25

*See* 14 C.F.R. § 294.1. If these exemptions from certification were also exemptions from preemption, states would be free to regulate these carriers. For the foreign carriers in particular, this second layer of regulation would undermine the State Department's prominent role in approving uniform national agreements for international air travel. *See* 49 U.S.C. § 41309(c) (2012). Even if the text were not clear, these implications, which cut against the core aim of the ADA to place the aviation industry under a single regulator, counsel against adopting West Virginia's proposed reading.

Finally, we note that recent federal legislation related to air ambulances reinforces our view that the ADA preemption clause reaches this industry. The FAA Reauthorization Act of 2018 took many steps to respond to steep air ambulance prices and valuable consumer complaints, but the Act kept regulatory authority firmly in the hands of the federal government. *See* Pub. L. No. 115-254, §§ 314, 418-20 (2018). For instance, the Secretary of Transportation was directed to "issue a final rule . . . to provide other consumer protections for customers of air ambulance operators." *Id.* § 418(f). The statute, moreover, invited state governments to participate in the development of a single federal policy, which is consistent with the uniform system of regulation that the ADA set up in the first instance. *Id.* § 412(b). In all events, Congress's decision to leave the preemption clause intact in the FAA Reauthorization Act, notwithstanding other amendments to subpart II, stands as one more reason not to import a strained and unnatural reading into the words of the ADA.

Taking together the text and structure of the statute, we conclude that the preemption clause reaches air ambulance companies like Air Evac. Whether Congress

26

has acted wisely as a matter of policy is not our business. It has spoken clearly, and it is our obligation to respect its judgment. Appellant invites us to begin to unravel the federal government's regulatory framework for interstate air travel, a result Congress expressly sought to avoid with the ADA. The recourse the appellant seeks rests with Congress, which alone has authority to amend the statute in a manner the state desires.

## B.

The foregoing discussion demonstrates that the ADA's preemption clause applies to the air ambulance industry. All that remains then, is to consider whether West Virginia's actions here are also within the scope of the clause. Specifically, we must decide whether the challenged laws and regulations both "relate to a price, route or service" and have "the force and effect of law." We shall address each question in turn.

## 1.

We first consider whether West Virginia's laws, taken together as a comprehensive scheme, "relate to a price, route, or service" of Air Evac. The text of the ADA defines "price" broadly to include any "rate, fare, or charge." 49 U.S.C. § 40102(a)(39). A state regulation satisfies this broad definition when it has a "a connection with, or reference to, airline prices, routes, or services." *Ginsberg*, 572 U.S. at 284 (quoting *Morales*, 504 U.S. at 384). This provision clearly covers more than just a state's attempt to regulate the price of a ticket. It is enough that the state law at issue has a "forbidden significant effect" on prices, even without referencing them directly. *Morales*, 504 U.S. at 388. Consistent with the ADA's text on this point, the Supreme Court has

found the requisite connection to price in cases involving participation in a frequent flyer program with redeemable miles, *see Ginsberg*, 572 U.S. at 284-85; and advertisements for airlines fares, *see Morales*, 504 U.S. at 387-88. Unsurprisingly, many state regulations structuring reimbursements to air ambulance companies, including those that limit patient billing and cap payments using a fee schedule, have also been found to "relate to" price. *See Bailey*, 889 F.3d at 1270-71; *Sullivan*, 2018 WL 3677002, at *7-8; *Valley Med Flight*, 171 F. Supp. 3d at 941. Even a state law incentivizing separate agreements between air ambulance companies and private insurers met this requirement because of the "clear and significant" effect of the law on air ambulance compensation. *Id.*

The challenged West Virginia laws clearly have a connection to air ambulance prices. The statutes and regulations for both the OIC and the PEIA directly reference air ambulance payments. These laws establish the maximum amounts that the state will pay directly to air ambulance providers, *see* W. Va. Code §§ 5-16-5(c)(1) ("All financial plans required by this section shall establish . . . [m]aximum levels of *reimbursement* which the [PEIA] makes to categories of health care services."); 23-4-3(a) ("[The OIC] shall establish . . . a schedule of the maximum reasonable *amounts* to be paid to health care providers . . . for the rendering of treatment or services to injured employees."), and limit the ability of those providers to seek recovery from anyone else, *see id.* §§ 5-16-8a(a) ("[A]ny air ambulance provider . . . may not collect from the [PEIA] and the covered employee or dependent of the employee, a combined *amount* for those services which exceeds the reimbursement *amount* then in effect for the federal Medicare program."); 23-4-3(a)(2) ("[T]he person, firm, or corporation rendering the treatment

28

may not make any *charge* . . . against the injured employee or any other person, firm, or corporation which would result in a total *charge* for the treatment rendered in excess of the maximum amount set forth [in the OIC] schedule.").

The regulatory scheme only exists because West Virginia was attempting to lower payments for air ambulance services. It set up the entire framework to achieve this result by, for example, requiring these companies to accept subscription fees as total reimbursement for state employees. *See* W. Va. Code § 5-16-8a(b) ("[T]he air-ambulance provider shall accept the fee or cost of the subscription service agreement as payment in full for any air-ambulance transport and related emergency treatment or services."). There was nothing subtle or indirect about this approach; it was directly targeted at payments for air ambulance services. *Cf. Valley Med Flight*, 171 F. Supp. 3d at 941. If such actions involving an air carrier are not "related to price," it is unclear what meaning the phrase would have left.[2]

2.

The final question left for us to answer is whether the challenged provisions have "the force and effect of law." 49 U.S.C. § 41713(b)(1). West Virginia argues they do not, and instead reflect nothing more than the state's participation in the health insurance market. As the state sees it, the steps it has taken to address air ambulance prices are no different from those of a private insurer bargaining to obtain the best price. We disagree.

---

[2] Because we find that the regulations here are squarely related to price, we need not consider whether they also relate to routes or services.

29

West Virginia has not acted like a private insurer in its regulation of the air ambulance market. Rather, it has used the coercive power that only sovereigns possess to achieve its goals. Accordingly, its actions here have the force and effect of law.

Many aspects of the federal-state relationship, including preemption, turn on whether the state was acting as a regulator—arraying its police power to coerce private conduct—or was instead acting as a market participant—using its bargaining power to achieve a desirable policy. Once the line between the two is drawn, the application is straightforward: when the state acts as a market participant, it is treated like a private party in the same market; when the state acts as a regulator, it is subject to the unique limits placed on states by our federal system. *See Hughes v. Alexandria Scrap Corp.*, 426 U.S. 794, 810 (1976) ("Nothing in the purpose animating the Commerce Clause prohibits a state, in the absence of congressional action, from participating in the market and exercising the right to favor its own citizens over others."); *Bldg. & Constr. Trades Council of Metro. Dist. v. Associated Builders & Contractors of Mass./R.I.*, 507 U.S. 218 (1993) ("When a State owns and manages property, for example, it must interact with private participants in the marketplace [and] is not subject to preemption."); *cf. City of Columbia v. Omni Outdoor Advertising, Inc.*, 499 U.S. 365, 379 (1991) ("We reiterate that, with the possible market participant exception, any action that qualifies as state action is ipso facto exempt from the operation of the antitrust laws." (internal quotation marks omitted)).

The market participant distinction is relevant here because a state's use of its buying power in the marketplace does not have "the force and effect of law." *Am.*

30

*Trucking Ass'n v. City of Los Angeles*, 569 U.S. 641, 649 (2013). The Supreme Court recently explained that this "phrasing [the force and effect of law] targets the State acting as a State, not as any market actor—or otherwise said, the State acting in a regulatory rather than proprietary mode." *Id.* at 650. Therefore, the ADA preemption clause protects air carriers from "state-imposed obligations" related to their prices, routes, or services, not from their "own, self-imposed undertakings." *Wolens*, 513 U.S. at 229. Given the purpose of the ADA to promote open market competition, this distinction makes perfect sense. As the Supreme Court recognized, "the ADA . . . was designed to promote maximum reliance on competitive market forces [and] [m]arket efficiency requires effective means to enforce private agreements." *Wolens*, 513 U.S. at 230 (quoting 49 U.S.C. § 40101 (2012)) (citations omitted). This is no less true simply because the party entering the contract is a state, acting as a purchaser like any other. What matters is that the state respect the line between regulatory power and market power, such that the terms of the deal reflect "agreements freely made, based on needs perceived by the contracting parties at the time." *Id.* (quotations omitted).

While West Virginia's recitation of the market-participant principle is close to the mark, it has little bearing on the program the state actually enacted. The state laws at issue here both limit reimbursement rates paid by the state and prevent air ambulance companies from seeking additional recovery from any third party. *See* W. Va. Code §§ 5-16-8a(a) (providing that an "air ambulance provider . . . may not collect from the plan and the covered employee or dependent of the employee, a combined amount for these services which exceeds" the PEIA reimbursement rate); 23-4-3(a)(2) (preventing health

31

care service providers from "mak[ing] any charge . . . against the injured employee or any other person, firm or corporation which would" exceed the OIC schedule amount). If a company objects, it faces the prospect of enforcement actions. Such a scheme— government dictates backed by civil and criminal sanctions—"counts as action 'having the force and effect of law' if anything does." *Am. Trucking Ass'n*, 569 U.S. at 651. Faced with similar efforts to limit third party payments for air ambulance services, other courts have had no trouble concluding that the state was acting in its regulatory, not proprietary, capacity. *See EagleMed LLC*, 868 F.3d at 901 ("[T]he Wyoming statute as it currently exists simply does not establish a voluntary contractual relationship.").

This is not to say that West Virginia cannot, moving forward, bargain for lower payments to air ambulance companies. It would be permissible for the state to use its considerable purchasing power as the insurer of state employees to negotiate better rates up front or limit reimbursements for air ambulance services after the fact.[3] As the program for state employees, the PEIA is a large part of the healthcare market in West

---

[3] The district court enjoined the statutes and regulations related to both the PEIA and OIC fee schedules and reimbursement caps. J.A. 112-13. It dismissed Air Evac's alternative claim that the balance-billing provisions were preempted. J.A. 113. Neither party on appeal sought review of that dismissal. *Cf.* Reply Br. at 20 (noting only that the fee schedule should not be preempted *if* both the balance-billing provisions and reimbursement caps were enjoined). Thus, the question of whether the fee schedule could be maintained without either the reimbursement caps or balance-billing provisions is not before us now, and we need not consider here whether the fee schedule, standing alone, has the force and effect of law. Nothing in our analysis forecloses the possibility that West Virginia, acting as a market participant, could use a uniform fee schedule to structure its own payments for air ambulance services in the absence of both the caps and the balance-billing prohibitions. *See EagleMed LLC*, 868 F.3d at 906 n.3.

Virginia and nothing in the preemption provision prevents that market power from playing a role at the negotiating table. The ADA does not require a state to pay whatever an air carrier may demand. *See EagleMed LLC*, 868 F.3d at 906 n.3 ("[W]e reiterate that the Airline Deregulation Act does not impose a duty on the State to pay air-ambulance claims."). In obtaining favorable terms, however, it must be the state's market power, and not its unique coercive authority, that is driving the negotiation.


V.


The enactment of the ADA transformed the states' role in American air transportation, giving federal regulators authority over much of the aviation sector. Now faced with high costs for air ambulances services, an industry that has grown substantially since the ADA's passage, states like West Virginia have not surprisingly pushed back on the deregulatory purpose of the ADA, arguing that it leaves them powerless to address local problems.

While it is certainly true that the ADA's preemption provision limits the options available to the states, it would be wrong to conclude that the ADA envisions no role for states like West Virginia moving forward. The state may still exert its considerable market power to obtain more favorable terms. *Am. Trucking Ass'n*, 569 U.S. at 650 ("When a state acts as a purchaser of services, it does not regulate the workings of the market, it exemplifies them." (citing *Building & Const. Trades Council*, 507 U.S. at 233) (internal quotation marks omitted)). Moreover, Congress's decision to subject air transportation to only one layer of regulation was accompanied by a commitment to work

33

with state governments in developing uniform national policy. *See, e.g.*, Airline Deregulation Act, Pub. L. No. 95-504, § 33, 92 Stat. 1705, 1732-33 (1978) (requiring the consideration of "the views of [the relevant] State agency" on small community air service issues). Federal legislation to address air ambulance billing, passed only a few months ago, demonstrates in even plainer fashion this significant cooperative potential. *See* FAA Reauthorization Act of 2018, Pub. L. No. 115-254, § 418.

The balance of state and federal responsibility created by the ADA is a complex balance in an exhaustively debated field that Congress has struck. As to that, we take no sides. Our own decision is not one of policy, but of law. That must be in the end what matters.

For the reasons discussed above, the judgment of the district court is

*AFFIRMED*.